# In the United States Court of Federal Claims

No. 21-2275C

(Filed Under Seal:  May 4, 2022)

(Reissued for Publication:  May 11, 2022)

|  |  |
|---|---|
| **SEVENTH DIMENSION, LLC**, | ) |
| *Plaintiff,* | ) |
| **v.** | ) |
| **THE UNITED STATES,** | ) |
| *Defendant.* | ) |

*Craig A. Holman*, Arnold & Porter Kaye Scholer LLP, Washington, DC, for Plaintiff.  Of counsel were *Stuart W. Turner* and *Trevor G. Schmitt*.

*Rebecca S. Kruser*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant.  With her on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Deborah A. Bynum*, Assistant Director.  Of counsel were *Michael J. Farr*, Commercial Litigation Field Support Center, United States Air Force Judge Advocate General's Corps, Joint Base Andrews, MD, and *David V. Peterson*, United States Army Special Operations Command, Fort Bragg, NC.

## OPINION AND ORDER[*]

*SOLOMSON*, **Judge.**

This case requires the Court to answer the question of whether, and under what circumstances, the government may cancel a Federal Acquisition Regulation ("FAR") part 15 procurement and start over from scratch.  The facts are reminiscent of "a game of

---

[*] Pursuant to the protective order in this case, the Court initially filed this opinion under seal on May 4, 2022, and directed the parties to propose redactions of confidential or proprietary information by May 11, 2022.  The parties have jointly submitted proposed redactions to the Court.  ECF No. 33.  The Court adopts those redactions, in part, as reflected in this public version of the opinion.  Words or phrases that are redacted have been replaced with [ * * * ].

Lucy and the football from the world of Charles Schulz."[1]  Plaintiff, Seventh Dimension, LLC — after successfully achieving its desired outcome in two successive protests — was the last offeror standing in this contractor edition of Survivor.  Although Seventh Dimension's proposal was highly rated, and offered a competitive price, Defendant, the United States — acting by and through the U.S. Department of the Army, Special Operations Command (the "Army" or "USASOC") — decided to pull the plug on the show, cancelling the procurement following a two-year process.  Pursuant to 28 U.S.C. § 1491(b), Seventh Dimension challenges the Army's decision to cancel the solicitation for Army Special Operations Forces ("ARSOF") training support as arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.  The parties filed cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").

For the reasons set forth below, the Court agrees with Seventh Dimension and finds that the Army's decision to cancel and resolicit the procurement was improper, and that Seventh Dimension is entitled to relief.

## I.    FACTUAL BACKGROUND[2]

### A.  The Solicitation

On March 13, 2019, the Army issued Solicitation No. H92239-19-R-0002 (the "Solicitation" or "RFP") for the ARSOF contract, as a set aside for service-disabled veteran-owned small businesses ("SDVOSB"), seeking "role player and direct support to field and situational training exercises in all ARSOF courses" for the U.S. Army John F. Kennedy Special Warfare Center and School.  AR 1 (§ A.5); AR 261–62 (§ C.1).  The Solicitation informed potential offerors that the Army intended to issue a single-award, indefinite-delivery, indefinite-quantity ("IDIQ") contract, under which firm fixed-price ("FFP") task orders would be issued, with a performance period covering a thirty-day phase-in period, an eleven-month base period, and four one-year option periods.  AR 140 (§ G); AR 142; AR 262 (§ C.1.5).  The ARSOF contract had a budgeted ceiling of $200

---

[1] *Bowen v. Hood*, 202 F.3d 1211, 1222 (9th Cir. 2000).

[2] This background section constitutes the Court's principal findings of fact drawn from the administrative record.  Judgment on the administrative record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005).  Citations to the administrative record (ECF No. 17, as amended by ECF Nos. 18, 19) are denoted as "AR" followed by the page number.  Additional findings of fact are contained in Section V.

million.  AR 2 (§ B); AR 140.  Proposals were due on April 19, 2019.[3]  AR 254–55 (RFP Amendment 0003).  The Army amended the Solicitation fifteen times; most of these amendments were issued after proposals were due.[4]

### B.  Initial Evaluations and Seventh Dimension's Pre-Award GAO Protest

The Army received nine proposals.  AR 1667–68 (Source Selection Decision Document).  From April 29, 2019 to May 30, 2019, the Source Selection Evaluation Board (the "SSEB") conducted initial evaluations of the proposals.  AR 1668.  On August 6, 2019, the Army established a competitive range of [ * * * ] offerors, including Seventh Dimension, Aquila Alliance, LLC ("Aquila"), and Reservoir International, Inc. ("Reservoir"), based on the results of the initial evaluations.  AR 1668.  On August 20, 2019, the Army initiated discussions, issuing evaluation notices ("ENs") and requests for final proposal revisions ("FPRs") to offerors.  AR 1900 (Seventh Dimension Debrief Letter).  That same day, effectively during discussions, the Army released RFP Amendment 0006.  AR 340 (RFP Amendment 0006).  This amendment revised the RFP to require the contractor to provide land and training facilities.  AR 343 (§ C.4.3).  The Army did not cancel the Solicitation due to the added land and facilities requirement, but rather set a due date for FPRs of September 20, 2019, for the [ * * * ] remaining offerors in the competitive range.  AR 459 (RFP Amendment 0008).[5]

On September 19, 2019, Seventh Dimension filed a pre-award solicitation protest with the Government Accountability Office ("GAO"), challenging Amendment 0006 on

---

[3] The original deadline for proposals was April 12, 2019.  AR 174 (RFP Amendment 0001).  On March 29, 2019, the Army changed the proposal deadline to April 17, 2019.  AR 174.  On April 10, 2019, the Army extended the deadline for proposals yet again, this time until April 19, 2019, to accommodate an appeal to the Small Business Administration, Office of Hearings and Appeals concerning the North American Industry Classification System code designation of the Solicitation.  AR 254–55 (RFP Amendment 0003).

[4] *See* AR 173–251 (RFP Amendment 0001) (issued Mar. 29, 2019); AR 252–53 (RFP Amendment 0002) (issued Mar. 29, 2019); AR 254–55 (RFP Amendment 0003) (issued Apr. 10, 2019); AR 256–337 (RFP Amendment 0004) (issued Apr. 15, 2019); AR 338–39 (RFP Amendment 0005) (issued June 5, 2019); AR 340–414 (RFP Amendment 0006) (issued Aug. 20, 2019); AR 415–57 (RFP Amendment 0007) (issued Aug. 22, 2019); AR 458–59 (RFP Amendment 0008) (issued Aug. 28, 2019); AR 460–514 (RFP Amendment 0009) (issued Sept. 13, 2019); AR 515–16 (RFP Amendment 0011) (issued Sept. 17, 2019); AR 517–18 (RFP Amendment 0012) (issued Sept. 25, 2019); AR 519–20 (RFP Amendment 0013) (issued Jan. 2, 2020); AR 521–64 (RFP Amendment 0014) (issued Jan. 23, 2020); AR 565–627 (RFP Amendment 0015) (issued Oct. 23, 2020).  Amendment 0010 appears to be missing from the administrative record.

[5] The original deadline for FRPs was September 3, 2019.  AR 341 (RFP Amendment 0006).  On August 28, 2019, the Army changed the deadline to September 20, 2019.  AR 459 (RFP Amendment 0008).

the grounds that it:  "(1) does not reflect the [Army]'s actual need for training facilities; (2) arbitrarily assesses the training facility on a pass/fail basis; (3) fails to consider the cost impact to the government of a remote training facility; and (4) does not consider National Environmental Policy Act (NEPA) requirements."  *Seventh Dimension, LLC*, B-417630.2, 2020 CPD ¶ 12, 2019 WL 7503309, at *3 (Comp. Gen. Dec. 26, 2019).  While this GAO protest was pending, the SSEB continued its evaluation process.  AR 1668.

On December 26, 2019, the GAO denied Seventh Dimension's protest, finding that: (1) Amendment 0006 reflects the needs of the Army and provides sufficient detail for the offerors to prepare their proposals; (2) the Army's decision to evaluate the training facility requirement on a pass/fail basis was within the Army's discretion, especially considering the Army's assertion that "its facilities requirement[] [is] *minimal in nature*" and "is only estimated to be a *small portion of the contract value*"; (3) the Army has sufficiently "explain[ed] that it considered the logistical costs" and that "the potential cost impact would be nominal"; and (4) the Solicitation does "require[] offerors to provide a detailed description of their ability to provide the training facilities in accordance with the [S]olicitation's revised requirements" and the Army acted within its discretion in not requiring offerors to "demonstrate their capability to satisfy NEPA requirements." *Seventh Dimension*, 2019 WL 7503309, at *4–8 (emphasis added).

## C. First Award and Seventh Dimension's SBA Protest

Following the GAO's decision, in January 2020, the SSEB provided its final evaluation results, including a trade-off analysis, to the Source Selection Advisory Council ("SSAC") Chair, "who reviewed the evaluation results to ensure that the evaluation process followed the evaluation criteria and the ratings were accurately and consistently applied."  AR 1668.  On January 28, 2020, the Source Selection Authority ("SSA") issued his source selection decision "[b]ased on his independent review of all the documents and review of the trade-off analysis conducted by the [SSEB] and the [SSAC] Chairperson," and selected Aquila for award.  AR 1668–69.

On February 3, 2020, Seventh Dimension filed a protest with the Small Business Authority ("SBA"), challenging Aquila's status as an SDVOSB.  *Seventh Dimension, LLC*, SBA No. VET-6057, 2020 WL 3411520, at *2 (June 11, 2020).  On April 3, 2020, the Director of the Office of Government Contracting ("D/GC") of the SBA denied Seventh Dimension's protest.  *Id.* at *1.  On April 16, 2020, Seventh Dimension filed an appeal with the SBA Office of Hearings and Appeals ("OHA"), requesting a reversal or a remand.  *Id.* On June 11, 2020, OHA granted Seventh Dimension's appeal and reversed the D/GC's decision, finding that Aquila is not an eligible SDVOSB.  *Id.* at *15.  As a result, on June 24, 2020, the Army concluded that Aquila was ineligible for award and retracted its selection decision.  AR 1669.

**D. Second Award and Seventh Dimension's Post-Award GAO Protest**

Upon conclusion of the SBA protest and the Army's withdrawing its award to Aquila, the Army established a new competitive range and resumed the source selection process.  AR 1669.  In particular, on October 19, 2020, the Army eliminated [ * * * ] additional offerors from the procurement, thereby forming a second competitive range [ * * * ] Seventh Dimension and Reservoir.  AR 1669.  Additionally, the Army issued price ENs to Reservoir and Seventh Dimension, with FPRs due on October 26, 2020.  AR 1425–28 (Competitive Range / Evaluation Notices); AR 1669.  From November 9–11, 2020, the SSEB evaluated Seventh Dimension and Reservoir's respective FPRs.  AR 1669.  On December 4, 2020, the SSAC issued its report and recommended awarding the contract to Reservoir.  AR 1651–66 (SSAC Comparative Analysis and Recommendation for Award).  On December 23, 2020, the SSA adopted the SSAC's recommendation and selected Reservoir for award.  AR 1667–78.  On February 16, 2021, the Army formally awarded the ARSOF contract to Reservoir and notified Seventh Dimension of its decision.  AR 1679–1826 (Contract No. H92239-21-D-0001); AR 1894 (Notice of Award).

On March 8, 2021, Seventh Dimension filed a post-award protest with the GAO, raising numerous challenges to the Army's decision to award the contract to Reservoir.[6]  AR 1827–89 (GAO Post-Award Protest).  Among other grounds, Seventh Dimension alleged that Reservoir [ * * * ] the required key personnel (or the Army unreasonably evaluated Reservoir's proposed key personnel) and that Reservoir's proposal contained [ * * * ] related to the proposed training facility.  AR 1827–64.

In response to Seventh Dimension's protest, the Army sent a letter to Reservoir on March 16, 2021, requesting information concerning Reservoir's key personnel and its proposed training facility.  AR 2954–55 (Army Request for Reservoir Verification).  Reservoir responded to the Army's inquiry on March 17, 2021, and admitted that it (1) [ * * * ],[7] and (2) [ * * * ].  AR 2956–57 (Reservoir Response to Verification Request).  As a result [ * * * ], the contracting officer ("CO"), on April 1, 2021, decided to take corrective action, cancelling the award to Reservoir and terminating the corresponding contract.  AR 2974–75 (Corrective Action Decision).  The Corrective Action Decision further indicates that the Army intended to "assess whether the requirements of this acquisition are still valid."  AR 2975.  That same day, the Army notified the GAO of its intent to take corrective action.  AR 2976–77 (Notice of Corrective Action).  Accordingly, on April 7, 2021, the GAO dismissed Seventh Dimension's protest.  AR 2978 (GAO Decision).

---

[6] Seventh Dimension filed a supplemental protest with the GAO on March 25, 2021.  AR 2958–67 (Seventh Dimension GAO Supplemental Protest).

[7] Specifically, the RFP required offerors to "verify and ensure the continuing availability of personnel for whom resumes are required and have been submitted," and to "immediately notify the Contracting Officer" if "personnel substitutions/change[s] occur prior to award."  AR 238 (incorporating SOFARS 5652.215-9009).

### E.   First Cancellation of the Solicitation

On April 13, 2021, the Army decided, in an internal memorandum, to cancel the Solicitation.  AR 2979–80 (Solicitation Cancellation Memorandum).[8]  The memorandum does not invoke a statutory or regulatory basis for cancelling the Solicitation but does summarize a number of changes to the Special Forces Qualification Course and related exercises that Army wanted to implement.  AR 2979.  There is no discussion or analysis of why the IDIQ contract contemplated by the ARSOF Solicitation was inadequate to meet the Army's needs.

In any event, on April 20, 2021, the Army notified Reservoir of the termination of the contract.  AR 2981–83 (Notice of Termination).  That same day, the Army conducted a "[s]ervice [c]ontract [d]ivestiture [r]eview."  AR 2984–3021 (Service Contract Divestiture Review Presentation); *see also* AR 3024 ("USASOC orchestrated a service contract review and divestiture to determine cost savings and redundant capability expenditures.").  The presentation indicates that the Army is "in the process of a re-draft and re-scope of the ARSOF Training Support Contract" and another contract, "where [the Army] will see significant savings."  AR 3008.  The Army projected savings from that effort of $1.15 million on a total value of approximately $28.21 million.  AR 3008.  That represents projected savings of just four percent.  This document similarly makes no mention of why the desired savings could not be achieved under the flexible IDIQ contract contemplated by the Solicitation.

On April 22, 2021, the Army issued a single-page internal memorandum indicating that "[s]tarting in Fiscal Year 2022, [the] 1st Special Warfare Training Group (Airborne) of the United States Army John F. Kennedy Special Warfare Center and School will no longer require the ARSOF Training Support Contract to provide land and facilities."  AR 3022 (Memorandum for USASOC – Land and Facility Requirements).

On June 4, 2021, the CO issued an internal memorandum explaining the Army's decision to cancel the Solicitation.  AR 3023–26 (Memorandum for Record – CO's Assessment of Facts Pertaining to the Request to Cancel Solicitation).  Referring to the April 13, 2021, Solicitation Cancellation Memorandum described above, the CO indicated that the Special Warfare Training Group requested cancellation of "the current solicitation for ARSOF Training Support Services due to extensive changes to their requirement."  AR 3023.  Citing GAO precedent, the CO indicated that the Army could cancel the Solicitation if the Army has "a reasonable basis" to do so — *e.g.*, "when a solicitation does not accurately reflect the agency's requirements, [and] particularly where cancellation . . . and the issuance of revised solicitation would present *the potential*

---

[8] The memorandum is mistakenly dated "13 April 2020."  AR 2979.

for increased competition." AR 3023 (emphasis added).[9] The CO implicitly acknowledged that cancellation had to be proper pursuant to FAR 15.206(e), which the CO read as requiring a determination that the planned "changes were so substantial as to be considered a material change." AR 3023; *see also* AR 3026 (summarizing FAR 15.206(e)). The CO's Memorandum for the Record concluded that "[w]ith a revised PWS (which reflects the [Army]'s current requirement) and a reduced scope in terms of ceiling value, it is reasonable to *assume* that there will be additional competition for this effort." AR 3026 (emphasis added). The CO explained that "*a new IDIQ* can be established with a ceiling value of $115[ million,] . . . [a] reduction in ceiling from $200[ million]," to accommodate the revised "[Independent Government Cost Estimate] values" and the various planned changes. AR 3025 (emphasis added). Although the CO indicated her intent to "resolicit the new requirement," the memorandum contains no explanation of why the contemplated IDIQ could not meet the Army's needs — under the current Solicitation, there is no requirement to spend $200 million (it is a ceiling, not a floor) and an IDIQ is by its nature flexible in terms of both ordering quantities and scope of services.

On July 8, 2021, the Army formally announced its decision to cancel the Solicitation and its intent to issue a new solicitation, citing "significant budget reductions[,] which have resulted in extensive changes to their requirement," including the removal of the facility requirement. AR 3027–28 (Notice of Solicitation Cancellation).

## F. Seventh Dimension's First Court of Federal Claims Protest

On July 26, 2021, Seventh Dimension filed a complaint against the United States in this Court, challenging the Army's decision to cancel the Solicitation. Complaint, *Seventh Dimension, LLC v. United States*, No. 21-1614C (Fed. Cl. July 28, 2021), ECF No. 1. Specifically, Seventh Dimension alleged, *inter alia*, that the Army's cancellation decision lacked a rational basis, was pretextually driven, and violated provisions of the FAR and SBA regulations. *Id.* ¶¶ 7–28 (summarizing claims). In particular, Seventh Dimension contended that the Army failed to "adequately document[] its cancellation decision" and that the Army's "decision to conduct market research for the ARSOF services on an unrestricted basis under various GSA vehicles" violated the "rule of two." *Id.* ¶¶ 14, 19–21, 108–112, 126–138.[10]

---

[9] As discussed *infra* Section V.B.2, the mere "potential" for increased competition is not the standard specified in FAR 15.206(e).

[10] The "rule of two" provides that a CO "shall set aside any acquisition over the simplified acquisition threshold for small business participation when there is a reasonable expectation that . . . (1) [o]ffers will be obtained from at least two responsible small business concerns; and (2) [a]ward will be made at fair market prices." FAR 19.502-2(b); *see also Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 112–13 (2020) (discussing and explaining the rule of two).

On September 2, 2021, the government notified the Court of its intent to take corrective action. Notice of Corrective Action, *Seventh Dimension*, No. 21-1614C (Fed. Cl. Sept. 2, 2021), ECF No. 19. The government specifically represented to this Court that the Army would reinstate the Solicitation and reconsider: "(1) whether USASOC's objective can be accomplished by making an award on existing proposals or amending, rather than cancelling, the [S]olicitation; (2) whether the IDIQ nature of the contract sufficiently addresses its budgetary concerns; and (3) whether the removal of the requirement to provide training facilities justifies cancellation." *Id.* at 1. The government further noted that "if USASOC determines that cancellation is still warranted, it also intends to address, in its cancellation decision, the results of the updated market research and its intent for resoliciting these services, to include addressing any rule of two and other applicable regulatory issues." *Id.* at 2.

Following the government's notice, the parties jointly moved to dismiss Seventh Dimension's complaint without prejudice based on the corrective action. Joint Motion for Dismissal, *Seventh Dimension*, No. 21-1614C (Fed. Cl. Sept. 10, 2021), ECF No. 21. Accordingly, the Court dismissed the case without prejudice on September 13, 2021. Judgment, *Seventh Dimension*, No. 21-1614C (Fed. Cl. Sept. 13, 2021), ECF No. 22.

### G. Second Cancellation and Proposed Resolicitation

On September 27, 2021, the Army held an internal meeting "to communicate [the] current ARSOF [contract] status and path forward." AR 3307–08 (ARSOF Status Meeting Agenda); *see also* AR 3309–11 (ARSOF Status Meeting Notes). There is no evidence, however, that the Army actually discussed the current Solicitation during the meeting; rather, both the meeting agenda and notes indicate that the Army discussed its plans to move forward with the cancellation and resolicit the work using an FFP as the procurement vehicle. AR 3307 (describing a "timeline" for the ARSOF contract, including the expiration of the existing bridge contract, the "New Solicitation," and the "Potential Next Bridging Solution"); AR 3309 (providing a "New [ARSOF Training Support Contract] Overview" and indicating "TBD when final execution of new contractor will take place"). Two days later, on September 29, 2021, the Army reinstated the Solicitation, in accordance with the corrective action notice filed with the Court. AR 3319–20 (Notice of Reinstatement); AR 3312–18 (SAM.gov Notice of Reinstatement); AR 3321 ("On 29 September 2021, the Contracting Officer re-instated the [S]olicitation via betaSAM.gov and sent separate notices to [ * * * ] offerors within the competitive range[.]"). That same day, the Army issued an internal memorandum documenting its decision to change the ARSOF contract type from an IDIQ to an FFP. AR 3305–06 (Memorandum for Record – Decision to Change Contract Type). In this memorandum, the Army "outline[d] its final decision" to change the contract vehicle from an IDIQ to an FFP as a result of the September 27 meeting. AR 3305 ("This memorandum outlines the final decision following a working group conducted with USASOC Contracting Staff, and the Command Suite staff . . . on 27 SEPT 21."). The memorandum asserted that the original

need for an IDIQ contract "was based on the Command's need for maximum flexibility by establishing a higher ceiling that would allow the contract to grow with future validated requirements and funding," but that such a need no longer exists due to the Army's experience with two FFP bridge contracts awarded during the procurement "with only a few modifications necessary." AR 3305. The memorandum further concluded that an FFP contract — as opposed to an IDIQ contract — would allow the Army to identify unspecified "performance uncertainties" and "places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss," while also "providing maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties." AR 3305.

On November 9, 2021, the CO issued an internal memorandum (the "Addendum") regarding the cancellation and corrective action. AR 3321–24 (Addendum – CO's Assessment of Cancellation). Therein, the CO concluded that "USASOC objectives cannot be accomplished by making an award on existing proposals or amending the [S]olicitation," and, thus, "the cancellation of the [S]olicitation remains warranted" due to "the significant changes and reductions to the requirement" and the change in contract type. AR 3321–24. With the exception of the putative change in contract type, the other changes were the same as those discussed in the CO's June 4, 2021, memorandum for the record, in which the CO acknowledged the suitability of an IDIQ contract vehicle. *Compare* AR 3023–26 (Memorandum for Record), *with* AR 3321–24 (Addendum). It is this November 9, 2021, cancellation memorandum upon which the government now relies to justify the Army's decision. *See* discussion *infra* Section V.B.2.

On November 18, 2021, the CO notified the SBA via letter that "it has completed voluntary corrective action" and that "the cancellation of the [S]olicitation remains warranted." AR 3352–55.

On November 22, 2021, the Army formally announced the cancellation of the Solicitation and its intent to resolicit the work. AR 3363–77 (Notice of Second Cancellation); AR 3379–85 (SAM.gov Cancellation Notice). The next day, the Army issued a pre-solicitation notice for Solicitation No. H92239-22-R-0002 ("Draft RFP"), covering the same services. AR 3386–87 (Pre-Solicitation Notice). On December 3, 2021, the Army issued the Draft RFP. AR 3388–3524 (Draft RFP). Subsequently, the Army released a revised Performance Work Statement for the Draft RFP. AR 3525–79 (Revised PWS).

## II.    PROCEDURAL HISTORY

On December 9, 2021, Seventh Dimension filed its complaint against the United States in this Court. ECF No. 1 ("Compl."). On December 23, 2021, the government filed the administrative record in this matter. ECF No. 17. On December 28, 2021 and

January 7, 2022, by leave of the Court, the government filed missing portions of the administrative record.  ECF Nos. 18, 19.

Seventh Dimension's complaint alleges that:  (1) the Army's cancellation of the Solicitation based on changed training requirements and contract type lacks a rational basis and contravenes procurement law (Counts I and II); (2) the Army's decision to cancel the Solicitation is pretextual (Count III); (3) the Army's decision to cancel the Solicitation is conclusory and insufficiently documented (Count IV); and (4) the Army violated statutory and regulatory obligations in cancelling the Solicitation (Count V). Compl. ¶¶ 68–124.

On January 21, 2022, the parties filed their respective motions for judgment on the administrative record.  *See* ECF No. 20 ("Def. MJAR"); ECF No. 21-1 ("Pl. MJAR").  On February 9, 2022, the parties filed response briefs.  *See* ECF No. 22 ("Def. Resp."); ECF No. 23 ("Pl. Resp.").  On March 1, 2022, the Court held oral argument.  *See* ECF No. 28 ("Tr.").

Per the direction of the Court, *see* ECF No. 29, the government filed supplemental documents on April 18, 2022, ECF No. 31.

## III.   JURISDICTION

The Tucker Act provides that an "interested party" may file an "action" in this Court "objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Tolliver Grp.*, 151 Fed. Cl. at 84 & n.11; *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 & n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'").[11]

Standing is an integral part of jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement[.]" (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984))).  To establish standing in a § 1491(b) action, a plaintiff must demonstrate that it is an "interested party." *Aero Spray*, 156 Fed. Cl. at 559 ("[T]he Tucker Act, as amended by [ADRA,] . . . defines not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them.").  An "interested party" is "[1] an

---

[11] *Cf. Tolliver*, 151 Fed. Cl. at 96–97 ("[A]lthough '[the Administrative Dispute Resolution Act ("ADRA")] covers *primarily* pre- and post-award bid protests,' the Federal Circuit in *RAMCOR* explicitly reversed this Court's determination 'that a [plaintiff] could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award' or the solicitation." (third alteration in original) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999))).

actual or prospective bidder or offeror [2] whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)).

In this case, the government does not challenge Seventh Dimension's standing or this Court's jurisdiction.  Nevertheless, the Court has an independent duty to ascertain whether it possesses jurisdiction to decide Seventh Dimension's claims and whether it has standing to pursue them.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (alteration in original) (quoting *Wright*, 468 U.S. at 750)); *see also* RCFC 12(h)(3).

Having considered Seventh Dimension's complaint, the Court concludes that Seventh Dimension qualifies as an interested party with respect to the procurement at issue; Seventh Dimension has sufficiently alleged facts that, if proven based on the administrative record, demonstrate the requisite prejudice for the purposes of interested party status and jurisdiction.  *See Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019) ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions.  But once we find that a party has standing, we must turn to the merits of the party's claim and determine whether it can prove it was prejudiced based on the record evidence." (citation omitted)); *see also James v. J2 Cloud Servs., LLC*, 887 F.3d 1368, 1372 (Fed. Cir. 2018) (courts reviewing a dismissal "for want of standing . . . must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party" (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))); *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 89 (2021) ("For the limited purpose of determining whether it has standing, a protestor's allegations are assumed to be true."); *Yang Enterprises, Inc. v. United States*, 156 Fed. Cl. 435, 444 (2021) ("The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry.").[12]

---

[12] The fact that a plaintiff may "successfully allege[] an injury (or prejudice) for standing purposes" — because if the plaintiff "succeeded on the merits . . . it would have a 'greater than an insubstantial chance of securing the contract'" — does not excuse a plaintiff from proving prejudice on the merits based on the administrative record.  *Am. Relocation Connections*, 789 F. App'x at 227 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

## IV.   STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1491(b)(4), this Court applies the standard of review contained in the Administrative Procedure Act (APA) § 10(e), 5 U.S.C. § 706.  *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019).  In particular, in accordance with the APA, this Court reviews an agency's procurement decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

"In applying the APA standard of review, this Court affords considerable deference to an agency's procurement decisions."  *IAP Worldwide Servs., Inc. v. United States*, -- Fed. Cl. --, 2022 WL 1021781, at *13 (2022) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)).  In reviewing an agency's procurement decision, the Court "determine[s] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'"  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  The Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citing *Colorado Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945)).  "On the other hand, the Court will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated in the administrative record; *post hoc* explanations for agency decisions ordinarily will be rejected."  *IAP Worldwide*, 2022 WL 1021781, at *13.

A plaintiff succeeds on the merits where it demonstrates, based on a trial on the administrative record,[13] that either:  "(1) the [agency]'s decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.  In deciding cross-motions for judgment on the administrative record, the Court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018) (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006)).  While an agency's administrative record "need not include detailed findings of fact," it "must inform the court . . . of the grounds of decision and the essential facts upon which the administrative decision was based." *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996) (quoting *Kitchens v. Dep't of Treasury*, 535 F.2d 1197, 1200 (9th Cir. 1976)), *quoted with approval in Palantir*, 904 F.3d at 994.  Although the APA's "substantial evidence" standard of review, 5 U.S.C. § 706(2)(E), does not apply to informal agency action (*e.g.*, an agency's procurement decisions),[14] the

---

[13] *See Bannum*, 404 F.3d at 1353–56.

[14] *See Advanced Data Concepts*, 216 F.3d at 1057–58 (explaining that "[t]he § 706(2)(A) 'arbitrary and capricious' standard applies to bid protests under 28 U.S.C. § 1491(b)(4) reviewed in the absence

arbitrary and capricious standard, from § 706(2)(A), "takes up the slack, so to speak, enabling the courts to strike down, as arbitrary, agency action that is devoid of needed factual support." *Ass'n of Data Processing v. Bd. of Governors*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 & n.25 (10th Cir. 1994) (discussing *Data Processing* and explaining that "[i]n addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record").[15]   Our appellate court, the United States Court of Appeals for the Federal Circuit, has concurred with *Data Processing* that the substantial evidence test "is only a specific application" of the arbitrary and capricious test "separately recited in the APA."  *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000) (quoting *Data Processing*, 745 F.2d at 683).

In addition, "to prevail in its bid protest, [a plaintiff] must 'show a significant, prejudicial error in the procurement process,' meaning it must show that there is a *greater-than-insignificant chance* that" the Army would have awarded the contract to Seventh Dimension "had [the Army] not committed the alleged errors."  *Am. Relocation Connections*, 789 F. App'x at 228 (emphasis added) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (post-award protest)); *see also Info. Tech.*, 316 F.3d at 1319 ("[T]he protestor's chance of securing the award must not have been insubstantial."); *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 265 (2021) (plaintiff must

---

of a hearing" and that because "[b]id protests in the absence of a hearing do not present an agency record derived from a hearing provided by statute or under 5 U.S.C. § 556 or 5 U.S.C. § 557[,] . . . the 'substantial evidence' standard does not apply" (citing *Camp v. Pitts*, 411 U.S. 138, 141 (1973))). *But see Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("The substantial evidence standard of 5 U.S.C. § 706(2)(E) 'applies to the trial court's review of agency findings.'" (quoting *Bannum*, 404 F.3d at 1357)); *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021) ("The substantial evidence standard of 5 U.S.C. § 706(2)(E) applies to a trial court's review of an agency's findings." (citing *Blue & Gold Fleet*, 492 F.3d at 1312)).

[15] The substantial evidence test, however,

> is not [a] substitute [for] the "arbitrary or capricious" standard applicable to informal agency action under § 706(2)(A) with the arguably more stringent standard of review applicable to formal agency action under § 706(2)(E).  It is simply an acknowledgment that "[w]hen the arbitrary or capricious standard is performing that function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense."

*Olenhouse*, 42 F.3d at 1575 (third alteration in original) (quoting *Data Processing*, 745 F.2d at 683–84)).

demonstrate that "but for the alleged error, there was a substantial chance that it would receive an award — that it was within the zone of active consideration" (alteration in original) (quoting *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011))).

# V.   DISCUSSION

## A.  Solicitation Cancellations — General Principles

There is no debate that the government generally has broad discretion to assess and define its needs.  *See Broaden v. Dep't of Transp.*, 2021 WL 5353890, at *3 (Fed. Cir. Nov. 17, 2021) ("Generally, agencies have broad discretion to define their own needs."). The Federal Circuit has confirmed that such discretion extends to the decision of whether to amend or cancel a solicitation based on changed circumstances.  *See Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013) (holding that agency's decision to cancel particular contract line items in a FAR part 15 solicitation was reasonable "due to budget constraints and a potential need to evaluate a different aircraft the following fiscal year"). An agency's discretion, however, is not boundless.  *See Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994) (finding "that GSA had no rational basis for the cancellation").[16]  Indeed, not only has Congress imposed limits on the Executive Branch regarding when it may cancel a solicitation but also the Executive Branch has imposed limits upon itself via the FAR.  Accordingly, before addressing the facts in this case, the Court must plot out the topography of those limits.  The relevant provisions are few, but that does not make the terrain any easier to navigate, particularly because there is no comprehensive Federal Circuit map to guide this Court.

We begin our tour of the legal landscape with the statutory provisions.  Congress has instructed: "***Except as provided in section 3301(b)*** of [Title 10], the head of the agency ***shall award*** a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the United States, considering only cost or price and the other factors included in the solicitation." 10 U.S.C. § 3303(c) ("Criteria for awarding

---

[16] *See also Veterans Contracting Grp., Inc. v. United States*, 920 F.3d 801, 806 (Fed. Cir. 2019) ("Because the government cannot cancel a solicitation solely to satisfy an agency's whim, we held that the cancellation was arbitrary and capricious." (citing *Parcel 49C Ltd.*, 31 F.3d at 1153–54)).  Notably, in *Land Shark Shredding, LLC v. United States*, the Federal Circuit summarized its holding in *Veterans Contracting* as follows: "the [agency] can cancel SDVOSB set-aside solicitations where there are no reasonable bids." 842 F. App'x 589, 592 (Fed. Cir. 2021) (citing *Veterans Contracting*, 920 F.3d at 806–07).  The CO in this case, however, did *not* conclude that Seventh Dimension's proposal was unreasonable or otherwise unawardable.  To the contrary, the Army's evaluation of Seventh Dimension's proposal concluded that it [ * * * ] and did not possess any deficiencies, significant weaknesses, or weaknesses.  AR 1670 (Source Selection Decision Document).

contract") (emphasis added).[17]  Just reading the latter half of that provision, one might think that the "shall award" command is focused only on the object of the sentence — *to whom* the contract must be awarded (*i.e.*, "the responsible source whose proposal is most advantageous," etc.) — as well as *how* "most advantageous" is assessed (*i.e.*, "considering only cost or price" and the other solicitation factors).  But the first clause — "[e]xcept as provided in section 3301(b)" — is critical to a correct reading of the statute  *Id.*  Section 3301(b), in turn, provides that "[a]ll sealed bids or competitive proposals received in response to a solicitation may be rejected if the head of the agency determines that such action is in the public interest."  10 U.S.C. § 3301(b) ("Rejection").[18]

Accordingly, the exception contained in 10 U.S.C. § 3301(b) — and referenced in § 3303(c) — has nothing to do with the *object* or *methodology* of contract award, but rather provides the only statutory basis for refusing to make any award at all.  In other words, the two provisions must be read together to require an award unless the "head of the agency" properly "determines" that the "public interest" favors rejecting all proposals. *See* 10 U.S.C. § 3301(b).  Thus, the statutes, read together, set up two mutually exclusive alternatives:  (1) award a contract pursuant to the operative solicitation; or (2) reject all proposals (and cancel the solicitation).

The FAR appears to implement those two statutory provisions, albeit with some modifications to the operative language: "The *source selection authority* may reject all proposals received in response to a solicitation, if doing so is in *the best interest* of the Government." FAR 15.305(b) ("Proposal evaluation") (emphasis added).[19]  FAR 15.305(b) thus swaps out "the head of the agency" in favor of "[t]he source selection authority" and "the public interest" in favor of "the best interest of the government."  *Compare* 10 U.S.C. § 3301(b), *with* FAR 15.305(b).[20]

In deciding to cancel the Solicitation at issue here, the government did *not* invoke either 10 U.S.C. § 3301(b) or FAR 15.305(b).  *See* Def. MJAR at 14 n.8, 37.  Nor does the government rely upon those provisions before this Court.  Tr. 12:10–18, 13:4–9

---

[17] As of January 1, 2022, part V of subtitle A of title 10 of the United States Code was reorganized and recodified.  *See* National Defense Authorization Act of 2021, Pub. L. No. 116-283, 134 Stat. 3388.  Section 3303(c) previously was codified at 10 U.S.C. § 2305(b)(4).

[18] Section 3301(b) previously was codified at 10 U.S.C. § 2305(b)(2).  *See supra* note 17.

[19] In a FAR part 14 procurement, the standard is different: "when the solicitation invites sealed bids[, and] after bids have been opened and made public, cancellation can occur only for compelling reasons."  *United States v. Int'l Bus. Machines Corp.*, 892 F.2d 1006, 1011 (Fed. Cir. 1989) (citing FAR 14.404-1 ("Cancellation of invitations after opening")).

[20] FAR 52.215-1, a common FAR solicitation clause inserted in solicitations pursuant to FAR 15.209, similarly puts offerors on notice that "[t]he Government may reject any or all proposals if such action is in the Government's interest."  FAR 52.215-1(f)(2).

(government confirming that it is not invoking the statute or FAR 15.305(b)); *see also* Def. MJAR at 12 (arguing that Seventh Dimension "ignores the explicit basis for the contracting officer's decision — FAR § 15.206(e)").  Instead, the government relies *solely* upon the CO's determination pursuant to FAR 15.206, which generally covers the topic of "[a]mending [a] solicitation."  *See* Tr. 141:11–12 (discussing the government's reliance on FAR 15.206(e) alone).

FAR 15.206 provides, in relevant part:

> (a) When, either before or after receipt of proposals, the Government *changes its requirements or terms and conditions*, the contracting officer shall amend the solicitation.

> (b) Amendments issued before the established time and date for receipt of proposals shall be issued to all parties receiving the solicitation.

> (c) Amendments issued after the established time and date for receipt of proposals shall be issued to all offerors that have not been eliminated from the competition.

FAR 15.206(a)–(c) (emphasis added).  To summarize, the CO must issue a solicitation amendment to capture any government changes to requirements or terms and conditions.  *See* FAR 15.206(a).  Where the government has yet to receive proposals, a solicitation amendment must be issued to all parties — *i.e.*, publicly.  *See* FAR 15.206(b).  Where, on the other hand, the government amends the solicitation after receipt of proposals, the government need only provide the amendment to those offerors remaining in the competition — *i.e.*, those not eliminated from the competitive range[21] or due to some other proposal defect.  *See* FAR 15.206(c).

Of dispositive significance in this case is FAR 15.206's cancellation provision:

> If, [1] in the *judgment* of the contracting officer, [2] *based on market research or otherwise*, [3] an amendment proposed for issuance after offers have been received [4] is so substantial as to exceed what prospective offerors reasonably could have anticipated, [5] so that additional sources likely would have submitted offers had the substance of the amendment been known to them, [6] the contracting officer *shall cancel the*

---

[21] *See* FAR 15.306(c); *see also* AR 1425–28 (Competitive Range / Evaluation Notices).

*original solicitation* and issue a new one, [7] regardless of the
stage of the acquisition.

FAR 15.206(e) (emphasis added).  In this case, only operative phrases [1], [2], [4], and [5]
are at issue.  In other words, this case comes down to whether the CO reasonably
exercised her "[1] judgment . . . [2] based on market research or otherwise" that the
Army's proposed amendment "[4] is so substantial as to exceed what prospective offerors
reasonably could have anticipated, [5] so that additional sources likely would have
submitted offers had the substance of the amendment been known to them." *Id.*

As discussed below, the government contends that (1) the word "judgment"
provides the CO with maximal discretion to cancel a solicitation, (2) the phrase "based
on market research or otherwise" places no constraint on the CO's judgment,
(3) notwithstanding the "so substantial" language, a proposed amendment need not
constitute a cardinal change to warrant cancellation of a solicitation, and (4) it is sufficient
if resolicitation *may* increase competition.  The Court rejects almost every aspect of the
government's interpretation and application of FAR 15.206(e).  Before delving into that
analysis, however, a little more cartography is warranted.

The Court begins with a point of agreement.  The Court agrees with the
government that FAR 15.206(e) indeed provides another means for cancelling a
solicitation — *i.e.*, an alternative route to 10 U.S.C. §§ 3301(b), 3303(c), and FAR 15.305(b).
*See* Tr. 11:13–17.[22]  But that begs the question: how can FAR 15.206(e), a regulatory
provision, effectively supplant the clear statutory command contained in 10 U.S.C.
§ 3303(c) that — when read in conjunction with § 3301(b) — requires an agency to award
a contract unless the "head of the agency" properly "determines" that the "public
interest" favors rejecting all proposals?

The most plausible answer[23] is that FAR 15.206(e) simply effectuates a different
statutory requirement of equal import: that an agency maximize competition pursuant to
the Competition in Contracting Act of 1984 (CICA), Pub. L. No. 98-369, 98 Stat. 1175
(codified as amended in scattered sections of titles 10, 31, and 41 of the United States

---

[22] The government variously (and inconsistently) contends both (1) that the statutory cancellation
provision, 10 U.S.C. § 3301(b), applies only where "there is no other method of canceling a
solicitation, [such] that [it] would be the default that the Government would have to use," Tr.
9:11–18, and also (2) that the government "see[s] [the provisions] as a menu of cancellation
options" that are "not exclusive of each other," Tr. 11:11–17.

[23] When asked how the government's view of FAR 15.305(b) would not swallow the statutory
provision, the government punted: "I think that would be a question for the Congress and the
FAR Council."  Tr. 12:7–8.  For better or worse, this Court does not have the luxury of waiting for
such a resolution, as "[i]t is emphatically the province and duty of the judicial department to say
what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Code). *See Golden Mfg. Co., Inc. v. United States*, 107 Fed. Cl. 264, 275 (2012) (citing CICA, 41 U.S.C. § 3301). Where a solicitation amendment would constitute a "cardinal change" (had it been issued as a contract modification), the change to the procurement may be "so substantial" (in the language of FAR 15.206(e)) that the government would be unfairly limiting competition were it *not* to permit other potential offerors to compete for the revised work. *See id.* ("It is [CICA's] statutory imperative for full and open competition that is violated if a procuring agency makes a cardinal change to a contract requirement after accepting bids in response to a solicitation."); *see also Utech Prod. v. United States*, 148 Fed. Cl. 542, 548 (2020) ("[CICA] establishes a general rule that federal agencies must 'obtain full and open competition through the use of competitive procedures.'" (quoting 41 U.S.C. § 3301(a)(1))).

Although "[t]he cardinal change doctrine was developed to discern whether modifications to a government contract were severe enough to constitute a breach of contract by the government," the "doctrine has found use in the bid protest context, as well." *Golden Mfg.*, 107 Fed. Cl. at 274. In the bid protest context, we "do[] not ask whether Government modifications breached a contract, but . . . instead whether Government modifications changed the contract enough to circumvent the statutory requirement of competition." *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). Contrary to the government's position,[24] there is no basis to distinguish between a case in which "a disappointed bidder learns of changes in the awardee's contract, and then attempts to invalidate the contract award on the grounds that the changed contract is not that which was competed by the agency," and a case in which a plaintiff challenges a cancellation based on FAR 15.206(e) as improperly evading 10 U.S.C. §§ 3301(b) and 3303(c). *Golden Mfg.*, 107 Fed. Cl. at 275 (citing cases and explaining that "[r]egardless of the procurement scenario, the inquiry is fundamentally the same"). In other words, CICA's concerns regarding cardinal changes to a procurement — at least

---

[24] *See* Tr. 16:4–9 (government arguing that cancellation was proper pursuant to FAR 15.206(e) even where putative changes "do[] not . . . rise to the level of a cardinal change"); *see also* Def. MJAR at 16–18 (arguing that cancellation pursuant to FAR 15.206(e) is "not restrict[ed] . . . only to situations where the offeror decides there is a cardinal change," but rather, "the correct standard is whether, in the contracting officer's judgment, the change would be 'so substantial' as to exceed what *prospective offerors* reasonably could have anticipated such that additional sources would have offered," and that "[t]his case simply belongs to a different type of bid protest scenario"); Def. Resp. at 4 & n.1 (asserting that "Seventh Dimension's understanding of the law of cardinal changes and how [it] interacts with FAR § 15.206(e) is defective" and that the CO "was not required to make a specific determination that the changes were equivalent to a cardinal change because FAR § 15.206(e) does not limit cancellation only to situations where a cardinal change has occurred").

as interpreted and applied by the Federal Circuit, this Court, and the GAO — are "carried forth in" FAR 15.206(e).  *Id.*[25]

There is at least one critical difference, however, between (1) a situation in which a disappointed offeror challenges a contract award as having avoided competition requirements (based on a subsequent contract modification alleged to constitute a cardinal change), and (2) a case in which a putative awardee challenges a cancellation based on a proposed amendment to a solicitation.  In the former, the fact that a plaintiff is seeking cancellation of an award (and a concomitant reprocurement) itself provides evidence of the likelihood of increased competition, assuming the plaintiff is otherwise an "interested party," 28 U.S.C. § 1491(b), and can demonstrate prejudice on the merits. In contrast, where a CO cancels a solicitation based upon a proposed solicitation amendment (and a contract award has not yet been made), the FAR requires the cognizant CO to have some concrete basis for concluding *both* that the proposed amendment is a cardinal change *and* "that additional sources likely would have submitted offers had the substance of the amendment been known to them."  FAR 15.206(e).  In other words, pursuant to FAR 15.206(e), the CO's assessment that the proposed amendment constitutes a cardinal change is necessary, but is not sufficient, to require cancellation.

In sum, where (1) a proposed solicitation amendment would so substantially alter the fundamental nature of the procurement such that it would essentially be a new and different procurement (*i.e.*, where the amendment would constitute a cardinal change),

---

[25] The GAO similarly has explained the relationship between CICA and solicitation cancellations. In *Emergent Biosolutions Inc.*, the GAO noted that "[o]nce a contract is awarded, [the GAO] generally will not consider protests against modifications to that contract, because such matters are related to contract administration and are beyond the scope of our bid protest function." B-402576, 2010 CPD ¶ 136, 2010 WL 2499422, at *7 (Comp. Gen. June 8, 2010) (citing 4 C.F.R. § 21.5(a) and other GAO decisions).  There is, however, "[a]n exception to this general rule" — where "a protester alleges that a contract modification is beyond the scope of the original contract, because, absent a valid sole-source determination, the work covered by the modification would be subject to the statutory requirements for competition." *Id.* (citing cases).  Likewise, in *Lasmer Industries, Inc.*, the GAO explained that "[w]hen a protester alleges that an order is outside the scope of the contract, we analyze the protest in essentially the same manner as those in which the protester argues that a contract modification is outside of the scope of the underlying contract." B-401046, 2009 CPD ¶ 77, 2009 WL 943884, at *5 (Comp. Gen. Mar. 30, 2009).  In such a case, "[t]he fundamental issue is whether issuance of the task or delivery order in effect circumvents the general statutory requirement under CICA that agencies 'obtain full and open competition through the use of competitive procedures' when procuring their requirements."  *Id.* (quoting 10 U.S.C. § 2304(a)(1)(A) (current version at 10 U.S.C. § 3201(a)(1))).  That question, in turn, requires a determination of "whether a modification . . . is a 'cardinal change' that triggers the competition requirements in CICA," for which the GAO "look[s] to whether there is a material difference between the modified contract and the contract that was originally awarded."  *Id.*

*and* (2) the CO has some concrete basis for believing that additional sources likely would participate in the competition if they were aware of the proposed amendment, an agency cannot arbitrarily limit the field of competition by transmitting the amendment only "to all offerors that have not been eliminated from the competition." FAR 15.206(c). Rather, in such a case, the agency *must* reopen the competition to any prospective offeror by cancelling the solicitation and starting over from scratch. FAR 15.206(e) (providing that "the contracting officer *shall* cancel the original solicitation and issue a new one" (emphasis added)). The FAR clearly permits a cancellation for such purposes at the very least up until contract award — *i.e.*, "regardless of the stage of the acquisition." *Id.*

The key predicate question of whether "an amendment proposed for issuance" is "so substantial" as to constitute a cardinal change is not subject to any precise mathematical analysis. *See Air-A-Plane Corp. v. United States*, 408 F.2d 1030, 1033 (Ct. Cl. 1969) ("'There is no exact formula . . . . Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole.' . . . [T]here is no mechanical or arithmetical answer . . . ." (first alteration in original) (quoting *Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 966 (Ct. Cl. 1965))). Accordingly, the FAR commits that assessment, in the first instance, to the "judgment of the contracting officer," which, along with the required impact-on-competition assessment, must be "based on market research or otherwise." FAR 15.206(e). Given the competing statutory requirement to award the contract (unless properly cancelled), *see* 10 U.S.C. §§ 3301(b), 3303(c), the CO's authority in FAR 15.206(e) is naturally constrained.[26] Although the FAR permits the CO to exercise "judgment" regarding whether a proposed amendment would constitute a cardinal change that "likely" would have competition implications, that "judgment" must be "based on market research or otherwise." FAR 15.206(e). If such "judgment" is reasonably exercised — again, "based on market research or otherwise" — to conclude that a proposed amendment would constitute a cardinal change such that there likely would have been greater competition had the substance of the proposed amendment been known, then the CO "*shall* cancel" the procurement and start over. *Id.* (emphasis added).

In this case, the Army proposed to change both the Solicitation's requirements as well as its terms and conditions, thereby necessitating a secondary decision: whether (1) to issue an amendment only to Seventh Dimension (as the only remaining, awardable offeror following the receipt and evaluation of proposals), *see* FAR 15.206(c), or (2) to cancel the Solicitation entirely pursuant to FAR 15.206(e). The Army selected the latter approach. The Court thus turns to evaluating the CO's decision against the requirements

---

[26] *See Est. of Allen v. United States*, 558 F.2d 14, 19 (Ct. Cl. 1977) (courts should "interpret[] . . . statutory language" in a manner that "not only gives effect to all provisions" in a statute "but also harmonizes" applicable regulations).

of FAR 15.206(e) — considering both the backdrop of 10 U.S.C. §§ 3301(b), 3303(c), as well as the administrative record.

### B. The Administrative Record Does Not Support the Army's Decision to Cancel the Procurement

#### 1. An Agency's Decision to Cancel a Solicitation Pursuant to FAR 15.206(e) Must be Based on Market Research or Similar Evidence and May Not Be Based on Conjecture or Supposition

At the outset, the Court notes once again the government's concession that the CO relied solely on FAR 15.206(e) to support her solicitation cancellation decision. *See* Def. MJAR at 12, 14 n.8 (conceding the CO did not rely on FAR 15.305(b) because she "did not base her decision on the need to reject all proposals"). The government acknowledges, as it must, that the plain terms of FAR 15.206(e) require that the CO's judgment be "based on market research or otherwise." Tr. 180:5–10 ("[GOVERNMENT'S COUNSEL]: I mean, all I can say, Your Honor, is that FAR 15.206(e) puts that in the judgment of the contracting officer. THE COURT: Based on market research or otherwise. [GOVERNMENT'S COUNSEL]: Right . . . ."). The administrative record, however, contains no such market research supporting the cancellation decision — indeed, the government concedes that point as well. *See* Tr. 23:18–24 ("THE COURT: Does the Government contend here that there is market research that supports this decision to cancel? [GOVERNMENT'S COUNSEL]: No, Your Honor. The contracting officer did not have any market research . . . .").

The government responds that FAR 15.206(e) does not require market research. Def. MJAR at 32 n.15; Def. Resp. at 16. Instead, the government effectively asserts that the CO's cancellation decision in this case is supported by an unbounded interpretation of the regulatory phrase "or otherwise." Tr. 24:24–25:9. According to the government at oral argument, "based on market research or otherwise," FAR 15.206(e), simply "means [that] the contracting officer must have a rational basis for the determination." Tr. 24:25–25:5. That position is consistent with the government's argument in its briefs that "the regulatory standards for the cancellation of a negotiated procurement are so extraordinarily permissive that they impose *no constraints* upon a contracting officer's discretion beyond what reasoned judgment requires." Def. MJAR at 14 (emphasis added) (quoting *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 126 (2010)). The government thus argues that "as applied to the cancellation of a negotiated procurement, the APA standard reduces to nothing more than rational-basis review." *Id.* (quoting *Madison Servs.*, 92 Fed. Cl. at 126–27). As the Court concludes below, the government's approach effectively deletes the regulatory phrase "based on market research or otherwise." FAR 15.206(e). But the government does not stop there. Indeed, the government goes so far as to assert that the CO's mere "'*assumption* that additional firms may well be interested in participating in a competition' is acceptable, if it is reasonable." Def. Resp. at 16

(emphasis added) (quoting *VSE Corp.*, B-290452.2, 2005 CPD ¶ 111, 2005 WL 1396999, at *5 (Comp. Gen. Apr. 11, 2005)).

While this Court agrees with the government that FAR 15.206(e) does not require market research *per se* and does not require a CO to definitively "prove[] that there has been a cardinal change," Def. MJAR at 17, the Court disagrees with both cases upon which the government relies — *Madison Services* and *VSE Corp.* The Court disagrees with the former because it reads operative language out of FAR 15.206(e) and with the latter because mere assumptions, unsupported by the administrative record, are insufficient to justify a solicitation's cancellation even under the deferential APA standard of review applicable to bid protest-type actions pursuant to 28 U.S.C. § 1491(b)(4).

The Court in *Madison Services* interpreted "[t]he phrase 'based on market research or otherwise'" as "naturally read to mean 'based on market research *or otherwise based*,' not . . . 'based on market research or other research.'" 92 Fed. Cl. at 128 (emphasis added). The undersigned disagrees with both readings — both that adopted and rejected in *Madison Services*. The phrase "or otherwise" need not be interpreted as requiring "research" *per se*, but it necessarily means *something*. It cannot be interpreted to completely delimit the phrase "based on market research" to the point where the entire clause has no meaning whatsoever. *See Glover v. West*, 185 F.3d 1328, 1332 (Fed. Cir. 1999) ("[W]e attempt to give full effect to all words contained within that statute or regulation, thereby rendering superfluous as little of the statutory or regulatory language as possible.").

Consistent with *Madison Services*, the government reads the phrase "based on market research or otherwise," FAR 15.206(e), as merely requiring "a reasonable basis for the contracting officer's decision." Tr. 25:7–9. But that interpretation plainly renders the operative regulatory phrase meaningless, as the APA would require a reasonable judgment even without that phrase. *See* Tr. 25:24–26:5 (government agreeing that the APA alone would require a CO's judgment to be reasonable even if the regulation at issue did not specify that his or her judgment be "based on market research or otherwise"). Moreover, *Madison Services* grafted the phrase "or otherwise *based*" onto FAR 15.206(e) without a textual basis for doing so. 92 Fed. Cl. at 128 (emphasis added). An examination of the provision precludes this reading because the operative phrasal verb in the provision is "based on," which is transitive, and thus requires an object.[27] In other words, the *Madison Services* reading of "otherwise based" would still need to specify an object: "otherwise based" on . . . *what*, precisely? *Madison Services* provides no answer.

---

[27] *Base something on something*, Cambridge Acad. Content Dictionary, https://dictionary.cambridge.org/dictionary/english/base-something-on-something (last visited Apr. 12, 2022) (identifying the phrasal verb as transitive and defining it as "to use information to support or prove an opinion or belief").

This Court is not without interpretive guideposts, however. The United States Supreme Court has instructed that we apply the *noscitur a sociis* canon of construction to avoid a statutory or regulatory interpretation where one word would swallow others: "As explained in *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995), we rely on the principle of *noscitur a sociis* − a word is known by the company it keeps — to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words . . . .'" *Yates v. United States*, 574 U.S. 528, 543 (2015); *see also United States v. Williams*, 553 U.S. 285, 294 (2008) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated.").[28] Applying that directive, this Court concludes that "[t]he word 'otherwise' . . . must be construed as limited in its application by the rule *noscitur a sociis*." *Comar Oil Co. v. Helvering*, 107 F.2d 709, 711 (8th Cir. 1939) (emphasis added); *see also In re Radio-Keith-Orpheum Corp.*, 91 F.2d 938, 940–41 (2d Cir. 1937) (interpreting the phrase "by summary proceedings or otherwise" using "the rule of 'noscitur a sociis'" such that the word "otherwise" means "a proceeding by a landlord to regain possession analogous to summary proceedings"); *United States v. Begaye*, 236 F.R.D. 448, 451 (D. Ariz. 2006) ("Where [a] statute says 'signed, or otherwise adopted or approved,' by ordinary principles of noscitur a sociis, we think this means an approval comparable to a signature[.]" (footnote omitted) (quoting *Campbell v. United States*, 296 F.2d 527, 532–33 (1st Cir. 1961))); *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 12 (D.C. Cir. 2002) ("The expression 'otherwise dispose' requires a similar interpretation under the principle *noscitur a sociis*."); *Donley v. Liberty Improvement Bank*, 40 Ohio St. 47, 50 (1883) ("[T]he general term, *otherwise* must be held under the maxim *noscitur a sociis* to cover only evidences or forms of debt of the same class as may accidentally have been omitted.").

There is another textual basis for this Court's rejecting the reading of FAR 15.206(e) that *Madison Services* adopted and that the government relies upon here: where the FAR wants to yield maximum discretion to a CO, the FAR knows how to do so. Indeed, the FAR not infrequently permits a CO to exercise "judgment" without specifying the type or class of information that must be considered. *See, e.g.*, FAR 11.201(a) ("Contracting offices will not normally furnish these cited documents with the solicitation, except when—. . . (2) *In the judgment of the contracting officer*, it would be impracticable for prospective contractors to obtain the documents in reasonable time to respond to the solicitation" (emphasis added)); FAR 15.306(d)(3) ("The scope and extent of discussions

---

[28] *Cf. Moore v. California State Bd. of Acct.*, 831 P.2d 798, 805 (Cal. 1992) ("Appellants urge us to invoke the principle of statutory construction known by the Latin names *ejusdem generis* and *noscitur a sociis;* that when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope. In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list." (citations omitted)).

are a matter of *contracting officer judgment.*" (emphasis added)); FAR 17.202(b) ("Inclusion of an option is normally not in the Government's interest when, *in the judgment of the contracting officer . . . .*" (emphasis added)).[29]  These provisions provide another reason why the Court will not — indeed, cannot — interpret FAR 15.206(e) to effectively remove the phrase "based on market research or otherwise."

The Court is loath to pile on, but yet further textual evidence undercuts the government's reading of FAR 15.206(e).  The predecessor version of FAR 15.206(e), which was located at FAR 15.606(b)(4), omitted the phrase "based on market research or otherwise."  *See* 48 C.F.R. § 15.606 (West 1996).  In that regard, the previous version provided, in relevant part: "If a change is so substantial that it warrants complete revision of a solicitation, the contracting officer shall cancel the original solicitation and issue a new one . . . ."  *Id.* § 15.606(b)(4).  In substantially revising FAR 15.606(b)(4) to its current form in FAR 15.206(e), the FAR Council added in a reference to the CO's "judgment," but also expressly required that such judgment be "based on market research or otherwise." Effectively reading the latter phrase out of FAR 15.206(e) is a step backwards to the now-defunct FAR 15.606(b)(4) language and would erroneously turn back the clock without notice-or-comment.  This Court cannot rewrite FAR provisions for the Army; instead, this Court must give effect to all the words in FAR 15.206(e).  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174, 176 (2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu stunt accipienda*).  None should be ignored.  None should needlessly be given an interpretation that causes it to . . . have no consequences. . . . [C]ourts avoid a reading that renders some words altogether redundant.").

---

[29] *See also, e.g.*, FAR 19.708(c)(1) ("The contracting officer may, when contracting by negotiation, insert in solicitations and contracts a clause substantially the same as the clause at [FAR] 52.219-10, Incentive Subcontracting Program, when a subcontracting plan is required (see [FAR] 19.702), and inclusion of a monetary incentive is, *in the judgment of the contracting officer*, necessary to increase subcontracting opportunities for [certain types of small or disadvantaged businesses] . . . and is commensurate with the efficient and economical performance of the contract . . . ." (emphasis added)); FAR 48.102(d)(2)(i) ("Where, *in the judgment of the contracting officer*, the prime contractor has demonstrated an effective [value engineering] program during either earlier program phases, or during other recent comparable production contracts . . . ." (emphasis added)); FAR 48.104-4 ("A no-cost settlement may be used if, *in the contracting officer's judgment*, reliance on other [value engineering change proposal] approaches likely would not be more cost-effective, and the no-cost settlement would provide adequate consideration to the Government." (emphasis added)); FAR 52.211-18 ("Upon the receipt of a written request for an extension, the Contracting Officer shall ascertain the facts and make an adjustment for extending the completion date as, *in the judgement of the Contracting Officer*, is justified." (emphasis added)).

In that regard, the Court challenged the government, at oral argument, to suggest an interpretation of "based on market research or otherwise," FAR 15.206(e), that would give meaning to the entire phrase:

> THE COURT:  So, then, [the government's interpretation of] "or otherwise," I mean, it just — it kind of guts the phrase "market research," doesn't it?
>
> [GOVERNMENT'S COUNSEL]:  I think it's meant to allow for this situation where there isn't market research *b[ut] the changes are . . . in the record*."

Tr. 28:21–29:3 (emphasis added).  But, again, the fact that "changes are in the record" is itself simply the predicate, or trigger, for the CO to consider whether an amendment, FAR 15.206(b)–(c), or, alternatively, cancellation, FAR 15.206(e), is required.  In other words, the mere fact that the Army plans to make changes to a solicitation — *i.e.*, there is a "an amendment proposed for issuance" — cannot, standing alone, support the CO's judgment that the proposed change "is so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them."  FAR 15.206(e).

Accordingly, this Court interprets the phrase "based on market research or otherwise" to mean "based on market research or evidence similar to market research."[30] That may include information or data already in an agency's possession or perhaps even an agency's concrete experience, although the Court need not define here all of the myriad ways in which an agency may reach a rational conclusion based on facts and evidence, as opposed to mere conjecture.[31]

In that regard, the GAO's conclusion in *VSE Corp.* — upon which *Madison Services* relied[32] and which the government relies in this case[33] — is fundamentally inconsistent with the APA's standard of review.  As noted above, the GAO in *VSE Corp.* condoned an

---

[30] This approach gives the phrase "or otherwise" its ordinary meaning.  *See, e.g., Or otherwise*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/or%20otherwise (last visited Apr. 8, 2022) (defining "or otherwise" as "used to refer to something that is different from something already mentioned").

[31] The Court likewise agrees with the government that "FAR 15.206(e) contemplates certainly something much less than absolute certainty that you will get more offerors."  Tr. 69:20–22.

[32] *See Madison Servs.*, 92 Fed. Cl. at 128 (citing *VSE Corp.*, 2005 WL 1396999, at *5–6).

[33] *See* Def. Resp. at 16 ("An 'assumption that additional firms may well be interested in participating in a competition' is acceptable, if it is reasonable." (quoting *VSE Corp.*, 2005 WL 1396999, at *5)).

agency's relying upon a mere "assumption . . . that competition may be increased." 2005 WL 1396999, at *5. The APA's standard of review requires more than mere assumptions, hypotheses, and guesses — it requires reasonable conclusions based on facts or other record evidence. *See Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (holding that under the arbitrary and capricious standard of review, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the *facts* found and the choice made'" (emphasis added) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962))); *see also Orchard Hill Bldg. Co. v. United States Army Corps of Eng'rs,* 893 F.3d 1017, 1027 (7th Cir. 2018) (explaining that "[c]ourts . . . extend no deference to agency decisions that lack record support or explanation" and rejecting agency finding as "little more than administrative *ipse dixit*"); *Bldg. Indus. Ass'n of Superior California v. Babbitt,* 1999 WL 33326722, at *4 (D.D.C. Mar. 31, 1999) (rejecting agency's "assumption" as "the kind of leap of faith that the [APA] does not permit" because "an agency's decisions must be based on evidence set forth in the administrative record"). Though "an agency's predictive judgments" are entitled to deference, *Nat'l Tel. Coop. Ass'n v. FCC,* 563 F.3d 536, 541 (D.C. Cir. 2009), such "judgment[s] must be based on some logic *and evidence,* not sheer speculation," *Verizon v. FCC,* 740 F.3d 623, 663 (D.C. Cir. 2014) (Silberman, J., concurring in part and dissenting in part) (emphasis added).[34]

The following colloquy with the government's counsel during oral argument further illustrates the Army's *ipse dixit* to support the cancellation decision at issue:

> THE COURT: . . . [W]hat does the phrase "based on market research or otherwise" add?
>
> [GOVERNMENT'S COUNSEL]: . . . I don't think the contracting officer can write "in my judgment, there would be more offers." . . . .
>
> THE COURT: That's because it would not sustain an APA review. . . . I don't understand what . . . [the *Madison Services*] decision does with the phrase ["based on market research or otherwise"] if it doesn't add anything to the APA standard of review.
>
> [GOVERNMENT'S COUNSEL]: Well, Your Honor, I think it explained that it must be ["]based on market research or otherwise based,["] so the contracting officer has to point to something in the record to support the changes.
>
> THE COURT: So[,] what does the CO point to here?

---

[34] These decisions are consistent with the standard of review outlined *supra* Section IV.

> [GOVERNMENT'S COUNSEL]: The CO points to the changes that were made to the [S]olicitation.

Tr. 26:8–27:3.  The circularity is readily apparent.  The government agrees both that the CO does not have plenary authority to cancel the Solicitation and that the CO's judgment that "there would be more offers" must be based on "something in the record."  Tr. 26:10, 25.  But then the government asserts that the "something" can be "the changes" themselves.  Tr. 26:24–27:3  According to the government, how do we know that there must be a solicitation amendment or cancellation?  The Army planned to make changes to the Solicitation.  How do we know the changes are so significant that, in lieu of amendment, cancellation is required due to competition concerns?  The planned changes are significant.  The government's response is a textbook question-begging assertion; the government cannot restate the question as an assertion and expect that response to satisfy the APA's standard of review.

Notably, the government asserts in its response brief that "the contracting officer relied on the discretion provided by FAR § 15.206(e) to cancel a solicitation based on her judgment that additional sources likely would have submitted offers if the proposed changes to the solicitation had been known to them."  Def. Resp. at 22.  The government, however, provides no citation to the administrative record.  The reason for the omission is plain: as explained *infra* Section V.B.2, the administrative record is devoid of any *facts*, beyond the changes themselves, supporting the CO's judgment "that additional sources likely would have submitted offers."  *Id.*

The Court must be clear about the relationship between the agency decision at issue and the administrative record.  The decision the Court is reviewing is the CO's cancellation decision.  *See* Tr. 24:19–21 ("THE COURT:  Well, the decision here is the CO's cancellation decision. [GOVERNMENT'S COUNSEL]: Yes.").  And it is that "cancellation decision [that] has to be tested against the record that underlies it."  Tr. 24:22–24 (government counsel concurring with the Court's assertion).  Critically, however, there is simply nothing in the administrative record supporting the CO's judgment that the proposed amendment "is so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them."  FAR 15.206(e).  The fact that "[t]he contracting officer did not rely on any one change, but instead on the effect of all changes, including a total change in the contract type," Def. MJAR at 20 (citing AR 3322), does not address the regulatory standard.  The Court still must ask: on what basis did the CO conclude that those planned changes meant "that additional sources likely would have submitted offers had the substance of the amendment been known to them"?  FAR 15.206(e).  In this case, as demonstrated *supra*, the government has no answer to that question besides pointing back to the changes themselves.  *See* Tr. 26:8–27:3.

The APA requires more from the Army than a mere hypothesis or conjecture that competition likely would increase were the Solicitation cancelled; it requires reasoned judgment based on *evidence* or *facts* contained in the administrative record.  A plaintiff succeeds on the merits where the administrative record lacks evidence to support an agency's determination.  *See Beno v. Shalala*, 30 F.3d 1057, 1074, 1076 (9th Cir. 1994) (noting that "the record contains a rather stunning lack of evidence" and finding that the administrative record was inadequate to support the agency's decision); *Calise Beauty Sch., Inc. v. Riley*, 1997 WL 630115, at *8 (S.D.N.Y. Oct. 9, 1997) ("Based on the lack of evidence in the administrative record . . . , the Court finds that it was arbitrary and capricious for the Secretary [of Education] to determine that the [regulatory] requirements . . . had been met . . . ."); *Peterson v. U.S. Dep't of Agric.*, 2014 WL 4809398, at *5 (D.N.D. Sept. 26, 2014) (concluding that "[t]he administrative record lacks evidence to support the agency's determination" and reversing the agency's decision).

This Court agrees, of course, that the nature and scope of the proposed Solicitation amendment (*i.e.*, the planned changes) are relevant considerations under FAR 15.206(e).  Standing alone, however, those considerations cannot support the CO's "judgment" that the amendment "is so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them." FAR 15.206(e).  That "judgment" — particularly the latter part, regarding the likelihood of additional offerors — must be based on market research or some other facts or record evidence that does not exist here.  *See, e.g., Rocky Mountain Helicopters, Inc. v. FAA*, 971 F.2d 544, 548 (10th Cir. 1992) ("The primary deficiency of the record in this case, lack of evidence to support a factual finding, is compounded where we have no indication from the record that the [agency's] response to the factual finding was well reasoned under the applicable statutes."); *cf. Golden Mfg.*, 107 Fed. Cl. at 280 ("*There is no indication in the record* that different offerors would have competed for the lots of trousers, or that their price proposals would have been restructured in response to the changes . . . ." (emphasis added)).

Indeed, even the GAO (at least once upon a time and in some decisions) has required more evidence than the Army's record contains here — either to sustain a protestor's claim that an agency should have cancelled a solicitation or to uphold an agency's cancellation decision.  In *Pro-Fab, Inc.*, B-243607, 91-2 CPD ¶ 128, 1991 WL 162538, at *3 (Comp. Gen. Aug. 5, 1991), for example, the GAO found "no factual basis in the record to warrant cancellation of the RFP" notwithstanding the Army's assertion "that the relevant technical data changes are significant and would improve the producibility of the item (and thus would increase competition)."  The GAO instead concluded that "the record does not support the agency's position." *Id.*  In particular, the GAO concluded that "[t]he agency's speculation that increased competition or cost savings will result from resolicitation of the identical requirements is not supported by the record . . . ." *Id.* (holding that "the record does not provide a reasonable basis for the

Army's cancellation of the RFP");[35] *see also Arjay Elecs. Corp.*, B-243080, 91-2 CPD ¶ 3, 1991 WL 123532, at *3 (Comp. Gen. July 1, 1991) ("There is no evidence in the record to suggest that the field of competition was changed due to the modification."); *Safety-Kleen Corp.*, B-274176, 96-2 CPD ¶ 200, 1996 WL 678429, at *4 (Comp. Gen. Nov. 25, 1996) ("[T]here is no evidence . . . that the competition would change as a result of the substitution . . . i.e., that more firms would have entered the original competition if the change had been incorporated in the original solicitation."); *Loral Fairchild Corp.*, B-242957, 91-2 CPD ¶ 218, 1991 WL 180591, at *2 (Comp. Gen. Aug. 29, 1991) ("Loral has not suggested that these changes precluded it from submitting a proposal, nor has it explained how the changes otherwise altered the potential field of competition. Accordingly, Loral's protest regarding the Air Force's issuance of the RFP amendment is denied.").[36]

### 2.   The Army's Decision to Cancel the Solicitation is Conclusory and Fails to Meet the FAR 15.206(e) Requirements

The government's concession, noted above, regarding the extent of the record evidence — or, more accurately, the lack thereof — is sufficient for this Court to find for Seventh Dimension on the merits.  Nevertheless, the Court examines the Army's decision to cancel the Solicitation as embodied in the CO's November 9, 2021, "Addendum" document, AR 3321–24.[37]  That Addendum contains very limited analysis regarding the CO's consideration and application of FAR 15.206(e), as follows:

> This change (in addition to all the other changes listed in original [Memorandum for Record]) are so substantial that it

---

[35] In *Pro-Fab*, 1991 WL 162538, at *4, the GAO "recommend[ed] reinstatement of the RFP" and saw "no reason to require another round of discussions since the offerors were given two opportunities to submit their [best and final offers] and the agency received an acceptable offer from Pro–Fab at a reasonable price."

[36] Notably, these older GAO decisions were applying the previous version of the FAR provision at issue, FAR 15.606(b)(4), which, as explained *supra*, did not even specify the required basis for the CO's judgment.  In contrast, the current version of the regulation, FAR 15.206(e), requires that the CO's judgment be "based on market research or otherwise," which this Court has interpreted as requiring facts or evidence similar to market research at a minimum.

[37] The parties debate whether the Court should entirely disregard the Addendum as a *post hoc* rationalization per the Supreme Court's decision in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. --, 140 S. Ct. 1891 (2020).  *See* Pl. MJAR at 3, 14, 23–24, 28; Pl. Resp. at 12–14; Def. MJAR at 23–26; Def. Resp. at 12–14.  Some language in that decision favors Seventh Dimension's view.  *See Regents*, 140 S. Ct. at 1908–09 ("Because Secretary Nielsen chose to elaborate on the reasons for the initial rescission rather than take new administrative action, she was limited to the agency's original reasons, and her explanation 'must be viewed critically' to ensure that the rescission is not upheld on the basis of impermissible '*post hoc* rationalization.' But despite purporting to explain the Duke Memorandum, Secretary Nielsen's reasoning bears

exceeds what prospective offerors reasonably could have anticipated. From a competitive perspective, *an offeror may view the guarantee of work through a FFP contract arrangement over that of an IDIQ.* In an IDIQ, the only guarantee is that of the Government's established minimum, and the Contractor is not promised any further work. Additional sources likely would have submitted offers had the substance of the amendment been known to them. In this instance, FAR 15.206(e) states that the Contracting Officer shall cancel the original solicitation regardless of the stage of the acquisition. Here, neither the offerors of existing proposals nor the

---

little relationship to that of her predecessor[, Acting Secretary Elaine C. Duke]. . . . . The policy reasons that Secretary Nielsen cites . . . are . . . nowhere to be found in the Duke Memorandum. . . . They can be viewed only as impermissible *post hoc* rationalizations and thus are not properly before us." (citations omitted)). Other language favors the government. *See id.* at 1907–08 ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.' If those grounds are inadequate, a court may remand for the agency to . . . 'deal with the problem afresh' by taking *new* agency action. An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action." (first quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015); and then quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947))). This Court need not resolve this disagreement, however, because this Court finds that the Addendum does not support the Army's cancellation decision in any event. Were the Court to reach this issue, the timing of the Addendum *does* raise some serious questions. In that regard, the government asserts:

> Seventh Dimension completely ignores that [the Army] has already decided that it will no longer be using an IDIQ contract for this work. No matter what Seventh Dimension thinks about the wisdom of this choice, *the final decision was made on September 29, 2021.* It was therefore reasonable for the contracting officer to take this change into account in her decision.

Def. Resp. at 8 (emphasis added). The problem is that, on September 29, 2021, the government informed Seventh Dimension (and Reservoir International, the previous putative awardee) that, as part of the Army's corrective action, the government will "[d]etermine whether the IDIQ nature of the contract sufficiently addresses its budgetary concerns." AR 3320. The government in its response brief cites a different memorandum in the administrative record, also dated "29 September 2021," that documents a "Decision to Change Contract Type," AR 3305–06, but that memorandum similarly begs the question why two offerors were told some additional analysis would be done when that seemingly was not the case. Indeed, the September 29, 2021, memorandum, AR 3305–06, appears to merely memorialize conclusions reached even earlier, during "a working group conducted . . . on 27 SEPT 21," AR 3305; *see also* AR 3307 (Status Meeting Agenda) (dated September 27, 2021).

30

offerors of proposals eliminated from the competitive range
could have anticipated such a sweeping change in contract
type.  This material change completely alters an offeror's
proposed pricing.  Cancellation is the only option that is
reasonable and logical and per the FAR.

AR 3322 (emphasis added).

There are almost certainly missing words in the emphasized sentence in the
preceding, quoted paragraph.  The Court assumes that what the CO meant was that "an
offeror may view the guarantee of work through a FFP contract arrangement *more
favorably* over that of an IDIQ."[38]  Even with the Court's emendation, however, not only
is there zero evidence in the record to substantiate that assertion, but also the relevant
standard is not whether an offeror "may view" the revised solicitation more favorably,
but rather whether "additional sources *likely would have submitted offers* had the substance
of the amendment been known to them."  FAR 15.206(e) (emphasis added).  No evidence
in the record supports that proposition.  Moreover, the idea that "an offeror *may* prefer
the guarantee of work through a FFP contract" — in lieu of an IDIQ — is undermined by
the Army's own asserted reasoning for preferring an FFP vehicle: "a[n] FFP contract type
places upon the contractor maximum risk and full responsibility for all costs and
resulting profit or loss."  AR 3305 (Memorandum for Record – Decision to Change
Contract Type).  Assuming for the sake of argument that there is a material difference
between an IDIQ contract consisting of FFP contract line items ("CLINs") and an FFP
contract that is not an IDIQ vehicle, the government never explains — or cites any facts
justifying — why "additional sources likely would have submitted offers had the
substance of the amendment been known to them."  FAR 15.206(e).

As for whether other offerors "of existing proposals" or "offerors of proposals
eliminated from the competitive range could have anticipated such a sweeping change
in contract type," AR 3322, that conclusion similarly is inapposite with respect to the
justification FAR 15.206(e) requires for cancellation (as it has nothing to do with whether
yet "additional sources likely would have submitted offers").  Moreover, the government
does not even attempt to explain the connection between the proposed amendment and
the grounds for which certain offerors were eliminated from the competitive range.  The
same is true with respect to the CO's emphasis on an "offeror's proposed pricing" —
what does that have to do with FAR 15.206(e) or the results of the procurement to-date
(where Seventh Dimension is the putative winner)?  Neither the CO's Addendum nor the
government before the Court answers that question.  The Court could understand
perhaps why the proposed amendment should be issued to other actual offerors,

---

[38] *See* Def. MJAR at 28 ("As the contracting officer explained, an offeror may *prefer* the guarantee
of work through a FFP contract over that of an IDIQ, where it is not guaranteed anything over
the minimum." (emphasis added) (citing AR 3322)).

*assuming* the amendment would remove the basis for their elimination from the competitive range (or otherwise restore eligibility for award). But the government did not explain any of those lines of reasoning in the Addendum, in its briefs filed with this Court, or during oral argument.

In the Addendum at issue, the CO further explained:

> The analysis in the original [Memorandum for Record] regarding the removal of contractor[-]provided training land adequately and reasonably justifies the cancellation, however, it must be re-iterated that it is a **combination** of all the changes mentioned previously, to include . . . the change in contract type, that together are assessed as surpassing the level of being material changes to the [S]olicitation. If a reasonable basis exists to cancel a solicitation, an agency may cancel the solicitation regardless of when the information first surfaces or should have been known, even if the solicitation is not canceled until after proposals have been submitted and evaluated, or even if discovered during the course of a protest.

AR 3324. Notably, while the first sentence of this excerpt from the Addendum asserts that "the removal of the contractor[-]provided training land adequately and reasonably justifies the cancellation," AR 3324, the Army made precisely the *opposite* argument in Seventh Dimension's GAO pre-award bid protest. Before the GAO, the Army contended that the facility and land requirements "are minimal in nature" and represent "a small part ([ * * * ] percent) of the overall requirement." ECF No. 31-2 at 26. The GAO expressly agreed with the Army in denying Seventh Dimension's protest. ECF No. 31-7 at 7 (unredacted GAO decision finding that the Army acted within its discretion to evaluate the training facility requirement on a pass/fail basis, especially considering the Army's assertion that the "requirement[] [is] *minimal in nature*" and "that the facilities at issue account *only for a small portion ([ * * * ] percent) of the requirement*" (emphasis added)). Remarkably, the Army *now* asserts that the removal of the training facility requirement is a significant change to the RFP, to the extent that it *independently* provides an "adequate[]" justification for the Solicitation's cancellation and the resolicitation of the procurement. AR 3324.

The Court finds that, at a minimum, the government's flip-flop critically undermines the Army's justification for cancellation; at worst, the government's new position is barred by the doctrine of judicial estoppel. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed.");

*Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1348 (Fed. Cir. 2019) (noting that where the federal government takes a certain position in a legal proceeding, it may "be judicially estopped from taking a contrary position" in a subsequent legal proceeding); *Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010) ("Judicial estoppel applies just as much when one of the tribunals is an administrative agency as it does when both tribunals are courts."); *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 127 (2011) ("Judicial estoppel may apply when a party," including a federal government entity, "takes a position before an administrative agency," such as the GAO, "that is later contradicted before a court." (citing *Trustees*, 593 F.3d at 1353–54)). *But see Haggart v. Woodley*, 809 F.3d 1336, 1345 n.10 (Fed. Cir. 2016) ("Although the Supreme Court has applied the equitable doctrine of judicial estoppel to bar state governments from asserting particular arguments, it has never expressly applied the doctrine to the federal government." (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001))). Moreover, the government does not even attempt to explain why the amendment adding the facility and land requirement did *not* necessitate cancellation and resolicitation of the procurement but the deletion of the very same requirement mandates cancellation. The Court cannot ignore this glaring inconsistency.

The last sentence of this excerpt from the Addendum incorrectly restates the Army's summary of the legal principle from FAR 15.206(e). Yes, where FAR 15.206(e) applies, an agency "*shall cancel the original solicitation* and issue a new one, *regardless of the stage of the acquisition*." FAR 15.206(e) (emphasis added). But what the Addendum's formulation conspicuously omits is that "a reasonable basis exists to cancel a solicitation," AR 3324, only where a CO determines "*based on market research or otherwise*, an amendment proposed for issuance after offers have been received *is so substantial* as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them," FAR 15.206(e) (emphasis added). And while the "combination of all the changes" may "surpass[] the level of being material changes," AR 3324 (emphasis omitted), that does not lead inexorably to the conclusion that they are "*so substantial* as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them," FAR 15.206(e) (emphasis added).

The Addendum's Conclusion section completely botches the applicable standard, further mudding the administrative record waters. In that section, the CO summarized her decision as follows:

> In a negotiated procurement, an agency has broad authority to decide whether to cancel a solicitation, and to do so need only establish a reasonable basis. A reasonable basis for cancellation exists and cancellation is appropriate since the current [S]olicitation does not accurately reflect the [Army]'s

> current requirements, particularly where cancellation of the
> [S]olicitation and the issuance of a revised solicitation would
> *present the potential for increased competition*.

AR 3324 (emphasis added). This summary ignores the language of FAR 15.206(e), which is the only provision upon which the government now relies. Critically, however, the relevant question is not whether cancellation "and the issuance of a revised solicitation would *present the potential for increased competition*," AR 3324 (emphasis added), but rather, in the language of FAR 15.206(e), whether "additional sources likely would have submitted offers had the substance of the amendment been known to them." That the CO in her Addendum was focused on the mere "potential for increased competition" perhaps explains why the government is forced to take the position before this Court that the Army was not required to have conducted market research[39] or to have based its cancellation decision on anything other than the fact of the planned changes — *i.e.*, because the record shows that the CO clearly believed that a mere hypothesis of "increased competition" was sufficient to support a cancellation decision.[40] That

---

[39] Remarkably, the CO, in the Addendum's Conclusion, acknowledged that "market research was being conducted and assessed through the course of this voluntary corrective action process." AR 3324. Why such market research did not seek to determine the impact of the proposed amendment or was not employed to support the cancellation decision remains a mystery to the Court. Similarly, the Addendum indicates that a particular General Services Administration IDIQ vehicle "remains a viable one as they currently support similar training requirements for other DoD agencies." AR 3324. Another Army SOF IDIQ contract was also researched. AR 3029–30 (Sources Sought Notice / RFI). The Army's continued consideration of IDIQ vehicles critically undermines the government's assertion that a non-IDIQ, FFP vehicle will somehow better meet the Army's needs. AR 3324.

[40] The government all but conceded this problem at oral argument:

> THE COURT: . . . [D]oes . . . the Justice Department agree with the GAO that all that's necessary is ["]the potential for increased competition["]?
>
> [GOVERNMENT'S COUNSEL]: I would say our position would be FAR 15.206(e) says *it has to be likely*, and there's the rational basis test that says there has to be a rational basis for that. I don't know . . . if mere potential is too low, but I think FAR 15.206(e) contemplates certainly something much less than absolute certainty that you will get more offerors.

Tr. 69:12–22 (emphasis added). The CO manifestly had no facts in her possession — at least none that are reflected in the administrative record filed with the Court — which would enable her to rationally conclude that there *likely* would have been more offerors had the substance of the proposed amendment been known to them. The Court, of course, agrees with the government

conclusion is erroneous both in terms of the correct interpretation of FAR 15.206(e), as well as the APA standard of review; a hypothesis is not the same a reasonable conclusion based on facts supported by the administrative record. *See Everpure, Inc.*, B-226395, 90-2 CPD ¶ 275, 1990 WL 278656, at *3 (Comp. Gen. Oct. 10, 1990) (where protestor merely "hypothecates that the field of competition would have differed," such speculation is insufficient to demonstrate that an agency's modifications were "beyond the scope of the original contract"); *Arjay Elecs. Corp.*, 1991 WL 123532, at *2 ("In determining whether the field of competition has been materially changed, we consider *whether there is evidence in the record* that bidders or offerors that were unable to offer an item meeting the original requirements would have been able to offer an item meeting the modified ones." (emphasis added)).

Nor is the Court convinced that the CO could reasonably determine that the proposed amendment in this case constitutes a cardinal change sufficient to trigger FAR 15.206(e).  As discussed *supra* Section V.A, FAR 15.206(e) requires the CO to consider whether a proposed amendment to the solicitation is "so substantial as to exceed what prospective offerors reasonably could have anticipated."  Moreover, this phrase necessitates that the "amendment proposed for issuance" be "so substantial" so as to constitute a cardinal change.  *Cf. Golden Mfg.*, 107 Fed. Cl. at 275 (citing FAR 15.206(e)). But if the cancelled IDIQ Solicitation is indeed sufficiently flexible to accommodate the Army's actual needs, then that would mean that the proposed amendment, by definition, is both anticipated, within the general scope of the contemplated work, and, thus, unnecessary.  In that regard, the government during oral argument all but conceded that the current Solicitation is adequate to meet the Army's needs:

> THE COURT: . . . Is there any other type of change where the IDIQ as contemplated wouldn't cover what you want to accomplish?
>
> . . . .
>
> [GOVERNMENT'S COUNSEL]: . . . I think our position would be more that it could be that Seventh Dimension is right, and this could all be accomplished with an IDIQ. I don't have a specific reason to get into whether it can be mod[ifie]d or not.  Our argument is that's not really the correct inquiry because that doesn't address the touchstone of 15.206(e), which is how could this affect other offerors out there.  If something could be done that's very small, *like the pass/fail*

---

that "something much less than absolutely certainty," Tr. 69:21–22, will suffice for the purposes of FAR 15.206(e).  But the CO's conclusion here is more akin to a guess or a hypothesis than it is to a reasoned conclusion based on facts.  Again, the CO herself applied only a "potential for increased competition" standard, AR 3324; "potential" and "likely" are plainly not synonymous.

35

> **land**, sure, *that could just be eliminated with a mod[ification], fine.* But what effect does that have on offerors now who could compete to just have role players?

Tr. 35:12–36:3 (emphasis added).[41]   This concession fundamentally undermines the notion that the proposed changes constitute a cardinal change.

In other words, the proposed amendment simply does not contain "fundamental changes . . . to contract requirements, . . . accompanied by large price changes," such that "the government's contract modifications [should be] deemed . . . cardinal changes." *Golden Mfg.*, 107 Fed. Cl. at 278; *see also DynCorp Int'l LLC v. United States*, 152 Fed. Cl. 490, 502 (2021) (explaining that, in *AT&T Commc'ns*, 1 F.3d at 1207, "the Federal Circuit compared the services called for in the original procurement with the services as modified and found that, because the modified services could have been anticipated by bidders during the solicitation phase, the modification did not violate CICA's competition requirements"); *Def. Grp., Inc.*, B-253795, 94-1 CPD ¶ 196, 1993 WL 603568, at *5 (Comp. Gen. Oct. 25, 1993) (change not substantial where "the amendment amounted to an increase of only 12.3 percent in the overall effort, and the nature of the additional effort . . . was the same as that already required under the RFP" (footnote omitted)); *Loral Fairchild Corp.*, 1991 WL 180591, at *2 (where requirement's "deletion did not significantly alter the purpose and nature of the contract," and where there is no evidence that changes would have "altered the potential field of competition," amendment in lieu of cancellation is proper); *Safety-Kleen Corp.*, 1996 WL 678429, at *4 (no "material" contract change where it does not "alter the fundamental purpose of the contract").

In *Everpure, Inc.*, the GAO concluded that particularly under a "flexible" contract — like an IDIQ vehicle — where "the government's requirements are indefinite," solicitation amendments that do not significantly alter the "overall purpose and nature of the original contract" are not cardinal changes. 1990 WL 278656, at *3; *see also Emergent Biosolutions*, 2010 WL 2499422, at *7 ("In determining whether a modification triggers the competition requirements under CICA, we look to whether there is a material difference between the modified contract and the contract that was originally awarded. Evidence of a material difference between the modification and the original contract is found by examining changes in the type of work, costs, and performance period between the

---

[41] The government's briefs contain similar suggestions that the IDIQ contract is adequate to meet the government's actual needs.  Def. MJAR at 27 ("[T]he question at issue in this protest is not whether the Government's needs would be better met by a FFP contract or an IDIQ contract, but whether the contracting officer was reasonable in relying on this change as a factor warranting cancellation of the [S]olicitation."); Def. Resp. at 9 ("Simply arguing that USASOC could have obtained the same services using the original solicitation does not address the substantiality of the changes relative to what prospective offerors could have anticipated and the increased competition aspect of FAR § 15.206(e).")

contract as awarded and as modified." (citations omitted)).  In *Emergent Biosolutions Inc.*, "given the broadly-defined, developmental nature of the . . . contract requirements," the GAO concluded that a particular modification did "not represent a material difference in the type of work from the original contract."  *Id.* at *8 (citing *AT&T Commc'ns*, 1 F.3d at 1205 (applying cardinal change test in bid protest case)).  Moreover "even substantial increases in cost do not inexorably compel a conclusion that a contract has been modified outside its original scope."  *DOR Biodefense, Inc.*, B-296358.3, 2006 CPD ¶ 35, 2006 WL 279311, at *7 (Comp. Gen. Jan. 31, 2006); *see also Def. Sys. Group*, B-240295, 1990 WL 293536, at *4 (Comp. Gen. Nov. 6, 1990) (increase in value of more than 120% did not materially change the contract based on in-scope changes to technical requirements); *Caltech Servs. Corp.*, B-240726, 92-1 CPD ¶ 94, 1992 WL 18500, at *3 (Comp. Gen. Jan. 22, 1992) (thirty percent overall increase in CLIN value not out of scope where the overall contractual purpose remains unchanged).

Beyond making conclusory assertions regarding the need for cancelling the Solicitation, the CO in her Addendum did not apply or address the foregoing considerations in any detail and, instead, invoked a cancellation test that is inconsistent with FAR 15.206(e).  In sum, the CO and the government before this Court point to no facts in the administrative record justifying the Army's cancellation of the Solicitation pursuant to FAR 15.206(e).  An amendment to a solicitation that is not necessary to meet the government's needs borders, in effect, on a pretext for cancellation.  In that regard, "[a]n agency's explanation for canceling a solicitation cannot be a pretext for an improper motive or reason, including those 'reflecting personal predilections of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence.'"  *Def. Tech.*, 99 Fed. Cl. at 122 (quoting *Parcel 49C Ltd.*, 31 F.3d at 1153).  The lack of a viable explanation for the proposed amendment here is particularly troubling where, as here, the cancellation comes at the eleventh hour and when there is only one viable, awardable offeror remaining.  *See* FAR 19.1405(c) ("If the contracting officer receives only one acceptable offer from a service-disabled veteran-owned small business concern in response to a set-aside, the contracting officer should make an award to that concern.").  That said, as discussed below, there is no concrete evidence in the record demonstrating that the Army has acted in bad faith or with malicious intent.

## C.  The Administrative Record Does Not Support Seventh Dimension's Specific Allegations of Bad Faith

Seventh Dimension asserts that the Army's explanations for the cancellation are a mere pretext to avoid awarding the contract to Seventh Dimension.  Compl. ¶¶ 99–103; Pl. MJAR at 32–35; Pl. Resp. at 21–22.  In particular, Seventh Dimension argues that "the record establishes" that one of the Army's true motives for cancelling the Solicitation was to avoid further protest actions.  Pl. MJAR at 32–33; Pl. Resp. at 21–22 ("[T]he [Army]'s cancellation was not motivated primarily by changes in its needs, but by weariness with protest activity under the instant Solicitation.").  Although the Court holds that the

Army's lack of facts justifying the proposed amendment borders on pretext, the Court, like the government, rejects Seventh Dimension's "innuendo that USASOC did not award it the contract due to some unstated, nefarious purpose." Def. MJAR at 30; *see also* Def. Resp. at 16–19.

FAR 1.102(b)(3) instructs agencies to "[c]onduct business with integrity, fairness, and openness." Furthermore, it is an axiom of federal contracting that "[t]he government has a duty to conduct fair procurements." *Veterans Contracting*, 920 F.3d at 806 (citing *Parcel 49C Ltd.*, 31 F.3d at 1152). There is a "strong presumption," however, "that government contract officials exercise their duties in good faith." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002). To overcome this presumption, a plaintiff must present "well-nigh irrefragable proof" that the government officials did not act in good faith. *Croman*, 724 F.3d at 1364 (quoting *Knotts v. United States*, 121 F. Supp. 630, 631 (Ct. Cl. 1954)).

Seventh Dimension argues that the Army's "stated justifications" for the cancellation "omit[] one of the main reasons for the cancellation": to avoid further protests. Pl. MJAR at 32–33. In support of this assertion, Seventh Dimension points to an email from the Army to the SBA concerning the second cancellation, in which the Army explained its cancellation as follows: "Based on numerous changes to the requirement *and multiple protest actions*, it has been determined in the best interest of the Government to uphold the cancellation of solicitation H92239-19-R-0002[.]" *Id.* at 33 (quoting AR 3357). According to Seventh Dimension, the reference to protests in the email is evidence that the Army's purported explanation for the cancellation "is at least in part a pretext," particularly given that the primary cancellation memoranda "make[] no mention of avoiding protests" as one of the justifications for cancellation. *Id.*

The Court is unconvinced that this email satisfies the evidentiary standard to demonstrate that the Army's cancellation decision was pretextual.[42] Moreover, as the Court noted in oral argument, the content of the email is sparse and could mean anything

---

[42] Furthermore, as the government correctly noted in its response brief, the Army *did* discuss in its cancellation decision the numerous protest actions brought during this procurement, albeit in the context of the protracted nature of the procurement and the need for bridge contracts:

> The original Acquisition Strategy was approved in February of 2019 and supported an IDIQ contract. This was based upon the Requiring Activity's need for maximum flexibility by establishing a higher ceiling that would allow the contract to grow with future validated requirements and funding. However, *due to constant protests and appeals that delayed award*, two bridge contracts . . . were awarded to ensure that services continued without disruption.

AR 3322 (Addendum) (emphasis added).

— it could mean what Seventh Dimension contends it means, or it could mean something else entirely, such as a mere reference to the fact that due to multiple protests, the Army found itself in a different position than when the procurement was initiated. *See* Tr. 162:24–163:6. In sum, the Court will not attempt to guess the true meaning of an email that is susceptible to multiple interpretations, nor can the Court conclude that this email constitutes *prima facie* evidence of impropriety. *See Am-Pro Protective Agency*, 281 F.3d at 1243 (finding that plaintiff's "assertions, with no corroborating evidence . . . fall short of the . . . 'well-nigh irrefragable'[] threshold").

Accordingly, the Court concludes that there is no concrete evidence that the Army's cancellation of the procurement, while improper and unjustified, was made with some specific improper motive.

## VI.    Seventh Dimension is Entitled to Injunctive Relief

In an action pursuant to 28 U.S.C. § 1491(b), this Court "may award any relief that the court considers proper, including declaratory and injunctive relief[,] except that any monetary relief shall be limited to bid preparation and proposal costs." *See CNA Corp. v. United States*, 83 Fed. Cl. 1, 10 (2008) ("[T]his court has discretion to fashion awards that include a mixture of injunctive relief and bid preparation and proposal costs."), *aff'd sub nom. The CNA Corp. v. United States*, 332 F. App'x 638 (Fed. Cir. 2009). The Court exercises its discretion to award Seventh Dimension part of the injunctive relief it seeks.

In deciding whether "a permanent injunction is warranted," this Court "must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp. Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)). "[P]roving success on the merits is a necessary element for a permanent injunction," but "[w]e may balance the remaining three *Centech* permanent injunction factors — irreparable harm, balance of hardships, and public interest — when deciding whether to grant or deny injunctive relief[.]" *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 & n.13 (Fed. Cir. 2018).

In this case, Seventh Dimension has succeeded on the merits, it will suffer irreparable harm in the absence of injunctive relief, and both the balance of the hardships and the public interest favor injunctive relief. The Court does not view the remedy question as a particularly close call.

This Court has developed a fairly well-defined set of injunctive relief principles routinely applied in § 1491(b) actions. For example, "[t]he Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the

opportunity to compete fairly for a contract." *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016) (quoting *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013)), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018).  That concept stretches back more than two decades.  *See, e.g.*, *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000) ("This type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm."); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 552 (2011) ("The Court concludes it is well-established that the potential profits that are lost to offerors when arbitrary procurement actions would deprive them of the opportunity to compete for a contract will normally be sufficient to constitute irreparable injury."); *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 245 (2012) ("This court, in many cases, has found that the loss of the opportunity to fairly compete for a contract constitutes irreparable harm."); *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 514 (2013) ("[The] denial of a fair opportunity to compete and loss of financial benefit from a lawful procurement process constitute irreparable harm."); *Red River Commc'ns, Inc. v. United States*, 109 Fed. Cl. 497, 518–19 (2013) ("This court has held that loss of an opportunity to compete constitutes irreparable harm."); *Sierra Nevada Corp. v. United States*, 154 Fed. Cl. 424, 440 (2021) ("This Court consistently has held that the lost opportunity to compete for a contract constitutes irreparable harm.").

Similarly, regarding the public interest injunctive relief factor, this Court has long held that where a "[p]laintiff has established that [a] defendant's contract award violated procurement regulations and involved arbitrary and capricious behavior[,] [t]he public interest in preserving the integrity of the procurement system . . . weighs in favor of granting injunctive relief." *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 117 (2013); *see also BCPeabody Constr. Servs.*, 112 Fed. Cl. at 514 ("It is well established that the public interest is well-served by ensuring that the government procurement process is fair and even-handed" (citing *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004), *aff'd*, 389 F.3d 1219)); *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (2000) ("Many cases have recognized that the public interest is served when there is integrity in the public procurement system.").  Judge Bruggink explained the "overarching" principle in *RLB Contracting, Inc. v. United States*: "The public interest always favors the correct application of law," and "[m]ore particularly, in the context of procurement statutes, the public interest always favors open and fair competition, and to that end, agency compliance with applicable regulations."  118 Fed. Cl. 750, 761–62 (2014) (citing *Lab. Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 654 (2014)), *aff'd*, 621 F. App'x 1026 (Fed. Cir. 2015); *see also HVF West, LLC v. United States*, 148 Fed. Cl. 45, 57 (2020) (holding that an injunction "to preserve the fairness of competition for government contracts . . . is not of minor import" because "indeed, this is the function of the court's bid protest jurisdiction").

These general principles do not amount to *per se* rules requiring an injunction, and no judge of this Court considering the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), appears to have applied that case to reject them. *See, e.g., RLB Contracting*, 118 Fed. Cl. at 761 & n.10 (concluding that "in the context of a bid protest, the loss of an opportunity to compete for an award for which a party would not otherwise be disqualified is sufficient injury to warrant injunctive relief" and distinguishing *eBay*); *Rush Constr., Inc. v. United States*, 117 Fed. Cl. 85, 102 (2014) ("[T]he acceptance of lost profits as a satisfactory showing of irreparable harm does not create a presumption that the court will award a permanent injunction. Nor does the court purport to establish such a presumption."); *MORI Assocs.*, 102 Fed. Cl. at 552 (holding that *eBay* "merely stands for the proposition that the four-factor test—which our court applies in bid protest cases—cannot be displaced by a general rule automatically granting injunctions for certain violations" and that "to recognize that meritorious bid protests that involve lost profits will satisfy the irreparable harm factor is not the same as automatically granting an injunction, as the other two factors must still be considered").

Here, the irreparable injury case is straightforward. Seventh Dimension should not be made, quite unfairly, to compete twice for a procurement it has all but won already, *see* FAR 19.1405(c), and where, as here, granting bid and proposal costs will not remotely compensate Seventh Dimension for its expenditures to date in competing for the contract award at issue. In contrast, the government will not be harmed by a limited injunction because the Army still will be able to meet its needs one way or the other. As the Court found above, *see* discussion *supra* Section V.B.2 (discussing Tr. 35:12–36:3), the government did not even attempt to demonstrate that a contract awarded pursuant to the Solicitation at issue would be inadequate to meet the Army's needs.[43] Moreover, the Court's limited injunction will preserve, as much as possible, the Army's discretion to act consistent with the applicable cancellation statues and regulations, as explicated in this opinion and order.

---

[43] There is no evidence in the record that, were the Army to award the contemplated IDIQ contract to Seventh Dimension, the Army somehow would be incapable of meeting all of its needs pursuant to that contract within its budgetary parameters. In that regard, the Army may easily delete the land and facilities requirement with a post-award, deductive contract modification because, as the Court determined, such a modification would not constitute a cardinal change. Moreover, the Army has not shown that the contemplated IDIQ contract would be insufficient to meet the Army's needs within its revised budget for the services the Army seeks to acquire. Again, given that the Solicitation is for an IDIQ-type contract with firm fixed-price task order CLINs, the agency must do more to justify a cancellation than provide a naked assertion — absent any factual support in the record — that a non-IDIQ FFP solicitation would either (a) produce more competition than occurred here, or (b) that the resulting contract fundamentally would better meet the agency's needs. The Army simply did not demonstrate an inability to satisfy its current needs under a contract with Seventh Dimension pursuant to the Solicitation nor did the Army demonstrate that the proposed amendments were necessary to meet the Army's needs (*i.e.*, putting aside the remaining requirements of FAR 15.206(e)).

The public interest in this case clearly favors requiring the Army to follow procurement statutes and regulations. That is particularly true where, as in this case, FAR 19.1405 provides that "[i]f the contracting officer receives only one acceptable offer from a service-disabled veteran-owned small business concern in response to a set-aside, the contracting officer *should* make an award to that concern." FAR 19.1405(c) (emphasis added). As this Court discussed at length in *IAP Worldwide*, 2022 WL 1021781, at *34, the term "should" "creates . . . a 'strong presumption'" in favor the identified course of action, *United States v. Maria*, 186 F.3d 65, 73 (2d Cir. 1999) (emphasis omitted) (quoting *United States v. Walker*, 98 F.3d 944, 945 (7th Cir. 1996)). FAR 2.101 defines "should" as "an expected course of action or policy that is to be followed unless inappropriate for a particular circumstance." The Court agrees with the government's position that if FAR 15.206(e) justified the challenged cancellation decision, then awarding a contract to Seventh Dimension would be "inappropriate." Def. MJAR at 36. But, given the Court's conclusion with respect to the application of FAR 15.206(e) — *i.e.*, finding for Seventh Dimension on the merits of its primary claim — FAR 19.1405(c) decidedly supports injunctive relief. Indeed, the larger context of FAR 19.1405(c) suggests that a SDVOSB set-aside "shall be withdrawn" only where an agency "receives no acceptable offers." The government here does not dispute that Seventh Dimension's proposal was acceptable under the terms of the applicable Solicitation, and, thus, the Court sees no reason why the general policy of FAR 19.1405(c) should not be effectuated. Nevertheless, as noted above, the Court will issue an injunction that preserves the Army's discretion as much as possible given the history of this procurement and the Court's findings.

Finally, in the government's motion for judgment on the administrative record, the government provides zero factual support for the claim that "[e]njoining USASOC from moving forward would hamper the proper functioning of the procurement system and further delay the performance of a necessary and important contract." Def. MJAR at 40. If the government is going to make arguments based on national security or the urgency of fulfilling a particular requirement, the Court expects the government to submit *facts* to support its arguments — and not rely on mere *ipse dixit*. *See, e.g., IAP Worldwide*, 2022 WL 1021781, at *50 ("The Court accepts the Major General's Harm Declaration and credits it fully.").[44]

---

[44] Moreover, the Court notes that the government entirely failed in its response brief to address Seventh Dimension's injunctive relief arguments. That failure may constitute a waiver. *See Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver."); *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 695 (2022) ("This Court will not permit a party to raise a phalanx of thin arguments in a dispositive motion — thereby forcing the opposing party to spend time and briefing space to engage with all of them — only to abandon them in the face of the counterarguments, and yet insist that the Court adjudicate the entire initial salvo. Such a buckshot-like approach to advocacy undermines both judicial economy and basic notions of fairness.").

## VII.   CONCLUSION

For the above reasons, the Court **GRANTS** Seventh Dimension's motion for judgment on the administrative record.  The Court **DENIES** the government's motion for judgment on the administrative record.

The Army's cancellation of Solicitation No. H92239-19-R-0002 is hereby **VACATED**, effectively immediately.  The Army shall promptly reinstate the Solicitation. The Army is further **ENJOINED** from proceeding with any and all reprocurement efforts for the work sought under the Solicitation until further notice.

Pursuant to RCFC 52.2, the Court retains jurisdiction of this matter pending a **REMAND** to the Army for further consideration, during which time this case remains **STAYED**.

The Army shall have sixty (60) days within which it must either:

1.   Award a contract to Seventh Dimension pursuant to the reinstated Solicitation (consistent with FAR 19.1405(c)); *or*

2.   Issue a new cancellation decision in compliance with the applicable statutes and regulations as explicated herein.

Accordingly, on or before Tuesday, July 5, 2022, the government shall file a status report, indicating which of those two options it has selected and certifying the Army's compliance with this order.  If the Army elects the second option (and issues a new cancellation decision), the Army shall pay Seventh Dimension its bid and proposal costs, *see* 28 U.S.C. § 1491(b)(2), in an amount to be determined in further proceedings. Furthermore, any new cancellation decision based upon FAR 15.206(e) must explain why the reinstated Solicitation — or an IDIQ contract awarded pursuant thereto — would be insufficient to meet the Army's current needs (and/or cannot be modified, post-award, to accommodate those needs).[45]

Notwithstanding RCFC 52.2(b)(2), the Clerk of the Court need not serve this opinion and order; rather, counsel for the United States is directed to provide a copy of

---

[45] The Court notes, in that regard, that the government — as part of its corrective action — specifically committed to examining "whether USASOC's objective can be accomplished by making an award on existing proposals."  Notice of Corrective Action, *Seventh Dimension*, No. 21-1614C (Fed. Cl. Sept. 2, 2021), ECF No. 19, at 1.  In the Court's view, this analysis is incomplete until the Army reasonably concludes that the contemplated IDIQ will not, and cannot, meet the Army's current needs.

this opinion and order to the cognizant contracting officer, which shall constitute service pursuant to that Rule.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
**Matthew H. Solomson**
**Judge**